COLIN M. GOURLEY, A MINOR, BY AND THROUGH
MICHAEL J. GOURLEY, HIS FATHER, AND LISA A. GOURLEY,
HIS MOTHER, AS NEXT FRIENDS AND NATURAL GUARDIANS, ET AL.,
APPELLEES, V. NEBRASKA METHODIST HEALTH SYSTEM, INC.,
A CORPORATION, APPELLEE, AND MICHELLE S. KNOLLA, M.D.,
AND OBSTETRICIANS-GYNECOLOGISTS, P.C., DOING
BUSINESS AS THE OB/GYN GROUP, APPELLANTS.
663 N.W.2d 43

Filed May 16, 2003. No. S-00-679.

William M. Lamson, Jr., Raymond E. Walden, and William R. Settles, of Lamson, Dugan & Murray, L.L.P., and John R. Klein for appellants.

Daniel B. Cullan and Paul W. Madgett, of Cullan & Cullan, and John Vail for appellees Colin M. Gourley et al.

James A. Snowden and Andrew B. Koszewski, of Wolfe, Snowden, Hurd, Luers & Ahl, for appellee Andrew Robertson, M.D.

Thomas J. Shomaker and Mary M. Schott, of Sodoro, Daly & Sodoro, for appellee Nebraska Methodist Health System, Inc.

Charles M. Pallesen, Jr., of Cline, Williams, Wright, Johnson & Oldfather, L.L.P., for amici curiae Nebraska Medical Association and Greater Nebraska Medical Coalition.

William F. Austin, of Erickson & Sederstrom, P.C., for amici curiae Nebraska Association of Hospitals and Health Systems and Cherry County Hospital.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, and McCORMACK, JJ., and HANNON and CARLSON, Judges.

PER CURIAM.

Neb. Rev. Stat. § 44-2825(1) (Reissue 1998) of the Nebraska Hospital-Medical Liability Act limits recoverable damages in medical malpractice actions to $1,250,000. The district court determined that the damages limitation was unconstitutional because it denied the appellees Colin M. Gourley and his parents, Michael J. Gourley and Lisa A. Gourley, equal protection of the law and a right to a jury trial. The appellants, Michelle S. Knolla, M.D., and Obstetricians-Gynecologists, P.C., doing business as the OB/GYN Group, contend that (1) the district court erred in determining that § 44-2825(1) was unconstitutional, (2) the jury verdict was invalid, and (3) the court erred in admitting hearsay and irrelevant evidence.

## I. NATURE OF CASE

The Gourleys brought this medical malpractice action against Nebraska Methodist Health System, Inc., and Nebraska Methodist

Hospital (collectively Methodist Hospital); Knolla; Marvin L. Dietrich, M.D.; Andrew Robertson, M.D.; Pauline R. Sleder, M.D.; OB/GYN Group; and Perinatal Associates, P.C. The Gourleys sought damages for injuries sustained by Colin because of the alleged negligent care Lisa received during her pregnancy. A jury awarded the Gourleys $5,625,000, and the district court entered judgment for the Gourleys in that amount and against Knolla and the OB/GYN Group.

## II. BACKGROUND

During her pregnancy, Lisa received prenatal care from Knolla, an obstetrician and gynecologist employed with the OB/GYN Group. On November 15, 1993, in the 36th week of her pregnancy, Lisa informed Knolla that she noticed less movement from the twin fetuses she was carrying. Knolla assured Lisa that this was common and that everything appeared to be normal. Two days later, Lisa called the OB/GYN Group to again report a lack of fetal movement and was told to come to the office to meet with Dietrich. Dietrich's examination revealed that one of the fetuses suffered from bradycardia, a decrease in the fetus' heart rate, and a lack of amniotic fluid. Dietrich instructed Lisa to proceed to Methodist Hospital for examination by Robertson, who was employed by Perinatal Associates.

During his examination, Robertson determined that an immediate cesarean section should be performed. Shortly thereafter, Colin and his twin brother, Connor, were delivered. Colin was born with brain damage and currently suffers from cerebral palsy and significant physical, cognitive, and behavioral difficulties.

The Gourleys filed suit alleging that Knolla and the OB/GYN Group failed to monitor Lisa and Colin while they were under their care. At the close of the Gourleys' case in chief, Methodist Hospital moved for a directed verdict. The court granted the motion and dismissed Methodist Hospital.

The jury found Knolla and the OB/GYN Group to be 60 percent and 40 percent negligent, respectively. The jury awarded the Gourleys $5,625,000. The Gourleys moved for a new trial, arguing that the court erred in granting a directed verdict to Methodist Hospital. The jury found for Dietrich, Robertson,

Sleder, and Perinatal Associates, and the court later dismissed them from the case.

The district court reduced the jury's award and entered judgment for the Gourleys and against Knolla and the OB/GYN Group, jointly and severally, in the amount of $1,250,000. The court found that § 44-2825(1) was constitutional.

The Gourleys filed a second motion for new trial, contending that the cap on damages imposed by § 44-2825 is unconstitutional because it violates their rights to (1) equal protection; (2) a jury trial; (3) an open court and full remedy; (4) substantive due process; and (5) life, liberty, and the pursuit of happiness. The Gourleys also alleged that the Legislature exceeded its power when imposing the cap and that the cap was unconstitutional special legislation.

Knolla and the OB/GYN Group also moved for a new trial because of 16 alleged errors, among which were that the verdict was not agreed to by five-sixths of the jury as required by Neb. Rev. Stat. § 25-1125 (Reissue 1995) and that the court erred in receiving certain exhibits and testimony into evidence.

The court (1) overruled the Gourleys' motion for new trial on Methodist Hospital's directed verdict and (2) overruled Knolla and the OB/GYN Group's motion for new trial, specifically rejecting their argument that the jury verdict was invalid. Knolla and the OB/GYN Group's other grounds for new trial were also overruled without explanation.

The court reversed its decision and concluded that the cap on damages in § 44-2825(1) violated equal protection under Neb. Const. art. I, § 3. The court also concluded that § 44-2825(1) violated the Gourleys' right to a jury trial under Neb. Const. art. I, § 6. The court found that § 44-2825(1) was severable from the rest of the act. The court vacated its previous order and entered judgment for the Gourleys and against Knolla and the OB/GYN Group, jointly and severally, in the full amount of $5,625,000. Knolla and the OB/GYN Group appeal.

### III. ASSIGNMENTS OF ERROR

Knolla and the OB/GYN Group assign that the district court erred in (1) denying their motion for new trial when the jury returned an invalid verdict; (2) admitting unsupported and hearsay

evidence in the form of a "Life Care Plan for Colin Gourley" by Terry Winkler, M.D.; (3) admitting a book, "What To Expect When You're Expecting," into evidence which contained hearsay, was itself hearsay, and was likely to confuse the jury; (4) overruling their motion for new trial; (5) declaring unconstitutional the damages cap of the Nebraska Hospital-Medical Liability Act, § 44-2825, and in reversing its order reducing the amount of the judgment to the statutory maximum of $1,250,000; and (6) applying its ruling on the constitutionality of the act retrospectively.

The Gourleys purported to file a cross-appeal, assigning that the court erred in granting Methodist Hospital's motion for directed verdict.

## IV. STANDARD OF REVIEW

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make such discretion a factor in determining admissibility. *Green Tree Fin. Servicing v. Sutton*, 264 Neb. 533, 650 N.W.2d 228 (2002). A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrains from acting, and the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system. *Gallner v. Hoffman*, 264 Neb. 995, 653 N.W.2d 838 (2002).

Statutory interpretation presents a question of law, on which an appellate court has an obligation to reach an independent conclusion irrespective of the decision made by the court below. *Newman v. Thomas*, 264 Neb. 801, 652 N.W.2d 565 (2002).

Whether a statute is constitutional is a question of law; accordingly, the Nebraska Supreme Court is obligated to reach a conclusion independent of the decision reached by the court below. *Hass v. Neth, ante* p. 321, 657 N.W.2d 11 (2003).

## V. ANALYSIS

### 1. Jury Verdict

Knolla and the OB/GYN Group argue that they are entitled to a new trial because the verdict was not agreed to by five-sixths of the jury as required by § 25-1125.

Section 25-1125 provides that "[i]n all trials in civil actions in any court in this state, a verdict shall be rendered if five-sixths or more of the members of the jury concur therein, and such verdict shall have the same force and effect as though agreed to by all members of the jury . . . ." Here, the jury signed and returned two verdict forms. We construe verdict form No. 2 as requiring the jury to determine which defendants were liable and verdict form No. 1 as requiring the jury to decide the amount of damages and how to apportion the defendants' negligence. Although 10 jurors signed both verdict forms, the forms were not signed by the same 10 jurors. This means that a juror who disagreed with the determination of who was liable provided the 10th vote necessary to decide the amount of damages and how to apportion the defendants' negligence. Thus, we must decide if a verdict is valid under § 25-1125 if the same five-sixths of the jury fails to agree on each essential issue embodied in that verdict.

In the absence of anything to the contrary, statutory language is to be given its plain and ordinary meaning; an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous. *Newman v. Thomas, supra.* Nothing in the plain language of § 25-1125 indicates whether the same five-sixths of a jury must agree on each essential issue embodied in its verdict. Several jurisdictions, however, have addressed the issue within the context of similar statutory and constitutional provisions, and we turn to these cases for guidance in construing § 25-1125.

Other jurisdictions have answered the question in one of two ways. See David A. Lombardero, *Do Special Verdicts Improve the Structure of Jury Decision-Making?*, 36 Jurimetrics J. 275 (1996). One group has adopted the "same juror" rule. See, e.g., *Stacy v. Truman Medical Center*, 836 S.W.2d 911 (Mo. 1992); *O'Connell v. Chesapeake & Ohio RR.*, 58 Ohio St. 3d 226, 569 N.E.2d 889 (1991); *Klanseck v Anderson Sales*, 136 Mich. App. 75, 356 N.W.2d 275 (1984); *Ferguson v. Northern States Power Co.*, 307 Minn. 26, 239 N.W.2d 190 (1976); *Clark v. Strain et al*, 212 Or. 357, 319 P.2d 940 (1958); *Fleischhacker v. State Farm Mut. Automobile Ins. Co.*, 274 Wis. 215, 79 N.W.2d 817 (1956). Under this rule, the same fractional group of jurors must concur on each issue necessary to support the ultimate verdict. See H. William

Walker, Jr., Comment, *Vote Distribution in Non-Unanimous Jury Verdicts*, 27 Wash. & Lee L. Rev. 360 (1970). If we adopt the same juror rule, the verdict would be invalid because the 10 jurors who determined which defendants were liable were not the same 10 jurors who apportioned the defendants' negligence and determined the amount of damages.

Other courts have rejected the "same juror" rule in favor of the "any majority" rule. See, e.g., *Hendrix v. Docusort, Inc.*, 18 Kan. App. 2d 806, 860 P.2d 62 (1993); *Young v. J.B. Hunt Transp., Inc.*, 781 S.W.2d 503 (Ky. 1989); *Williams v. James*, 113 N.J. 619, 552 A.2d 153 (1989); *Schabe v Hampton Bays*, 103 A.D.2d 418, 480 N.Y.S.2d 328 (1984); *Jaurez v. Superior Court of Los Angeles Cty.*, 31 Cal. 3d 759, 647 P.2d 128, 183 Cal. Rptr. 852 (1982); *Tillman v. Thomas*, 99 Idaho 569, 585 P.2d 1280 (1978); *McChristian v. Hooten*, 245 Ark. 1045, 436 S.W.2d 844 (1969); *Ward v. Weekes*, 107 N.J. Super. 351, 258 A.2d 379 (1969). Under this rule, all jurors are free to deliberate and vote on every issue "regardless of their votes on other issues. . . . Plaintiff prevails if the specified number of jurors find in her favor on each element." Lombardero, *supra*, at 298. If we adopt the any majority rule, the verdict would be valid, because at least 10 jurors found for the Gourleys on each element necessary to support a verdict in their favor.

Although there are persuasive arguments for both rules, we conclude that the "any majority" rule better serves the purposes underlying § 25-1125. See *Volquardson v. Hartford Ins. Co.*, 264 Neb. 337, 352, 647 N.W.2d 599, 611 (2002) ("[w]hen construing a statute, an appellate court must look to the statute's purpose and give to the statute a reasonable construction which best achieves that purpose, rather than a construction which would defeat it").

The movement to abolish the unanimous verdict requirement was meant to improve judicial efficiency while preserving fundamental fairness in the jury system. As one court has explained: "Nonunanimous verdicts decrease the number of mistrials and retrials and thus reduce court congestion, delay and the cost of maintaining the judicial system. They also reduce the number of unjust verdicts deriving from juror obstinacy or dishonesty and discourage compromise verdicts." *Schabe v Hampton Bays*,

103 A.D.2d at 423, 480 N.Y.S.2d at 333. See, also, *Ward v. Weekes, supra.*

Courts have recognized that the "mechanistic" same juror rule does less to improve judicial efficiency than the any majority rule. *Tillman v. Thomas, supra.* Under the same juror rule, the same fractional group of jurors must agree on each issue necessary to support the ultimate verdict. For example, in a typical personal injury case, only the jurors in the five-sixths majority that agreed that a defendant was negligent could vote on the question of damages. The votes of any jurors who dissented on the negligence question could not be used to reach a five-sixths majority on the damages question. As a result, if the 10 jurors who agreed on the negligence question could not agree on the question of damages, the result would be a hung jury.

But under the any majority rule, a juror who dissents on one issue is allowed to vote on subsequent issues. A juror who disagreed on the question of negligence would still be eligible to provide the vote needed to reach a five-sixths majority on the question of damages. This flexibility reduces the risk of hung juries, as well as all of the associated costs and delays, thus advancing the policy of judicial efficiency underlying § 25-1125 better than the same juror rule. See, *Young v. J.B. Hunt Transp., Inc.*, 781 S.W.2d 503 (Ky. 1989); *Williams v. James*, 113 N.J. 619, 552 A.2d 153 (1989); *Schabe v Hampton Bays*, 103 A.D.2d 418, 480 N.Y.S.2d 328 (1984); *Jaurez v. Superior Court of Los Angeles Cty.*, 31 Cal. 3d 759, 647 P.2d 128, 183 Cal. Rptr. 852 (1982).

Those courts that have adopted the same juror rule have generally conceded that it will lead to less judicial efficiency than the any majority rule. They have argued, however, that two other principles are more important than judicial efficiency, unanimity of the statutorily required minimum number of jurors and consistency in individual juror voting. David A. Lombardero, *Do Special Verdicts Improve the Structure of Jury Decision-Making?*, 36 Jurimetrics J. 275 (1996). We are not persuaded by either argument.

Those courts that have relied upon unanimity in adopting the same juror rule see the verdict as a "non-fragmentable totality," representing "one ultimate finding on the basis of several issues." H. William Walker, Jr., Comment, *Vote Distribution in*

*Non-Unanimous Jury Verdicts*, 27 Wash. & Lee L. Rev. 360, 363-64 (1970). Thus, the verdict cannot be " 'the product of mixed thoughts.' " *Clark v. Strain et al*, 212 Or. 357, 364, 319 P.2d 940, 943 (1958) (quoting *The State v. Bybee*, 17 Kan. 462 (1877)). Instead, it must represent the unified thinking of the statutorily required minimum number of jurors.

This reasoning is misplaced. "The requirement of the same jurors agreeing, which is a necessary characteristic of a unanimous verdict, needs [sic] not remain when there has been a change permitting less than unanimity to be the jury's verdict." *Naumburg v. Wagner*, 81 N.M. 242, 245, 465 P.2d 521, 524 (N.M. App. 1970). We see no reason to "maintain the semblance of unanimity after the requirement of unanimity ceases to exist." *Id*. See, also, *Williams v. James, supra*.

More recent decisions adopting the same juror rule have relied primarily upon the principle of consistency. See, *O'Connell v. Chesapeake & Ohio RR.*, 58 Ohio St. 3d 226, 569 N.E.2d 889 (1991); *Ferguson v. Northern States Power Co.*, 307 Minn. 26, 239 N.W.2d 190 (1976). These courts contend that inconsistent votes on related issues "indicate that the jurors disagree or do not comprehend." Lombardero, *supra*, at 301. They also question the ability of jurors in the dissenting minority on one issue "to cast aside their opinions and vote on subsequent issues as if they agreed with the majority." *Id*. Courts have been particularly concerned about the ability of a juror who dissented on the question of who was negligent to fairly participate on the question of how to apportion negligence. See, e.g., *O'Connell v. Chesapeake & Ohio RR.*, 58 Ohio St. 3d at 235, 569 N.E.2d at 897 ("where a juror finds that a plaintiff has not acted in a causally negligent manner, it is incomprehensible to then suggest that this juror may apportion some degree of fault to the plaintiff and thereby diminish or destroy the injured party's recovery").

We are not persuaded that the concerns over consistency are enough to reject the benefits of the any majority rule. We have more faith in the mental capabilities and ethical integrity of jurors than the courts that have adopted this line of reasoning. We refuse to presume that a juror who dissents on one issue will violate his or her oath and attempt to subvert the deliberations on a subsequent issue, even if the issues are integrally related.

See *Ward v. Weekes*, 107 N.J. Super. 351, 258 A.2d 379 (1969). In our view, it is more likely that a juror who is outvoted on one issue can " 'accept the outcome and continue to deliberate with other jurors honestly and conscientiously to decide the remaining issues.' " *Jaurez v. Superior Court of Los Angeles Cty.*, 31 Cal. 3d 759, 768, 647 P.2d 128, 133, 183 Cal. Rptr. 852, 857 (1982) (quoting *Ward v. Weekes, supra*).

Moreover, the same juror rule sacrifices a principle of the jury system that is more fundamental than either unanimity or consistency. That principle is that "all members of a jury . . . partake meaningfully in [the] disposition of the case." *Schabe v Hampton Bays*, 103 A.D.2d 418, 424, 480 N.Y.S.2d 328, 333 (1984). The same juror rule reduces the ability of a juror who dissents on one issue to meaningfully participate in the discussion of the remaining issues. The dissenter remains free to express his or her opinions on the remaining issues, but with the power to persuade divorced from the power to vote, the dissenter's influence is reduced to "a state of practical impotence." *Schabe v Hampton Bays*, 103 A.D.2d at 424, 480 N.Y.S.2d at 333.

By contrast, the any majority rule preserves the principle of full participation in the deliberative process. A juror who dissents on one issue retains the ability to vote on subsequent issues. Thus, the power to vote remains united with the power to debate and the dissenter can deliberate fully and effectively on each issue presented to the jury.

Accordingly, because we believe that it furthers judicial efficiency while protecting fundamental fairness better than the same juror rule, we adopt the any majority rule. A juror is free to deliberate and vote on each issue presented to the jury, even if the juror has dissented from the majority on a previous issue. Even though a juror, who disagreed on the question of who was liable, provided the 10th vote necessary on the damages and apportionment questions, the verdict was valid.

## 2. LIFE CARE PLAN

At trial, the Gourleys called Winkler, a specialist in physical medicine and rehabilitation, to testify about the life care plan that he had developed for Colin. A life care plan is a comprehensive document which includes the items of service, medications,

doctor's visits, and equipment a disabled person will need over the course of his or her life, as well as the costs associated with each of these items. During the direct examination of Winkler, each page of the life care plan was displayed to the jury and received into evidence.

As we understand their brief, Knolla and the OB/GYN Group make two complaints about Winkler's testimony and the life care plan. First, they claim that the life care plan and some of Winkler's testimony contained opinions that were too uncertain to be relevant. Second, they argue that the life care plan was inadmissible hearsay.

(a) Relevance

During direct examination, Winkler admitted that for several of the items that he included in Colin's life care plan, he could not state to a reasonable degree of medical certainty that Colin would require that item in the future. He explained that he included these items in the life care plan "to provide information to everybody involved just to help make decisions."

Knolla and the OB/GYN Group argue that the court erred in allowing Winkler to testify about those items for which he was not reasonably certain Colin would need in the future. Similarly, they argue that the life care plan should not have been admitted into evidence because it contained information about these items. We agree, but conclude that the error was harmless.

An expert's opinion need not be expressed with reasonable certainty within the expert's field of expertise, but may be expressed with reasonable probability. The expert's opinion must be sufficiently definite and relevant to provide a basis for the fact finder's determination of an issue or question. *Renne v. Moser*, 241 Neb. 623, 490 N.W.2d 193 (1992). Expert testimony should not be received if it appears the witness is not in possession of such facts as will enable him or her to express a reasonably accurate conclusion as distinguished from a mere guess or conjecture. *Franksen v. Crossroads Joint Venture*, 257 Neb. 597, 599 N.W.2d 603 (1999). When an expert's opinion is mere speculation or conjecture, it is irrelevant. See *Snyder v. Contemporary Obstetrics & Gyn.*, 258 Neb. 643, 605 N.W.2d 782 (2000). Whether an expert's opinion is too speculative to be admitted is a question for the trial

court's discretion. See, *id.*; *Anderson/Couvillon v. Nebraska Dept. of Soc. Servs.*, 253 Neb. 813, 572 N.W.2d 362 (1998).

Winkler admitted that he included information in the life care plan about items for which he was not reasonably certain Colin would need in the future. The context of his testimony makes clear that he was guessing that Colin might possibly need these items. An expert opinion which is merely speculation or conjecture is inadmissible. Here, the court erred by allowing Winkler to testify about the items for which he admitted that he was not reasonably certain Colin would need in the future. Similarly, information about these items should have been redacted from the life care plan before it was accepted into evidence.

That does not, however, end the inquiry. Not every error justifies a new trial; only an error which is prejudicial to the rights of the unsuccessful party does so. *Westgate Rec. Assn. v. Papio-Missouri River NRD*, 250 Neb. 10, 547 N.W.2d 484 (1996). In the absence of such an error, the successful party, having sustained the burden and expense of trial, may keep the benefit of the verdict. *Id.* In a civil case, the admission or exclusion of evidence which unfairly prejudices a substantial right of the complaining litigant constitutes reversible error. *State v. Whitlock*, 262 Neb. 615, 634 N.W.2d 480 (2001). When it appears from the record that evidence wrongfully admitted in a jury trial did not affect the result of the trial unfavorably to the party against whom it was admitted, its reception is not prejudicial error. See *Westgate Rec. Assn. v. Papio-Missouri River NRD, supra.*

Here, the record shows that although information about items which Colin was not reasonably certain to need in the future was wrongfully admitted into evidence, the receipt did not affect the result of the trial. Instead, the record shows that the jury knew which items Winkler was not reasonably certain Colin would need; that the court instructed the jury to consider only items Colin was reasonably certain to need; and that consistent with the instruction, the jury excluded those items in making its award.

Winkler treated items differently in the life care plan if he was not reasonably certain Colin would need them, and he explained these differences to the jury.

The first part of the life care plan is a 28-page spreadsheet. It provided information about each item that Winkler believed Colin

would need or might need because of his disability. The items are listed in horizontal rows. Spaces appear in each row that allowed Winkler to provide eight types of information about each item as follows: (1) when Colin would need the item, (2) how many years Colin would need it, (3) how often Colin would need it, (4) the purpose of the item, (5) the likely vendor of the item, (6) a range of per-unit prices for the item, (7) a range of per-year prices for the item, (8) and any additional comments that Winkler believed necessary to explain the item. Winkler testified that if he was reasonably certain that Colin would need an item in the future, he provided an estimate in the space for the range of per-year prices, but that if he was not reasonably certain that Colin would need the item, he left that space blank.

The second portion of the life care plan was designed to demonstrate how much an item would cost over the course of Colin's life. Every item listed in the first portion of the life care plan was also listed in the second. But, as he explained to the jury, Winkler included only an estimate as to how much an item would cost over the course of Colin's life if he was reasonably certain Colin would need the item in the future. If he was not reasonably certain Colin would need the item, he put zero for the cost of the item. At the end of the second section of the life care plan, Winkler provided a total sum of $12,461,500.22 for all of the items in the life care plan which he was reasonably certain Colin would need.

The jury was aware of exactly which items in the life care plan Winkler was not reasonably certain Colin would need in the future. Moreover, at the end of the trial, the jury was told that it could not consider such information. The court instructed the jury that it could award the "reasonable value of medical, hospital, nursing, therapy, rehabilitation, medical equipment and similar care and supplies reasonably needed by and actually provided to the Plaintiffs and *reasonably certain to be provided in the future.*" (Emphasis supplied.)

It is clear that the jury followed the instruction and excluded from its final award those items which Winkler was not reasonably certain Colin would need. As noted, Winkler estimated the total cost to be $12,461,500.22 over the course of Colin's life for items which he was reasonably certain Colin would need. Later

in the trial, an economist testified that the present value of that amount, depending on which discount factor was used, was a minimum of $5,943,111. But the jury awarded only $5 million in damages. Thus, the jury did not even award damages for each of the items Winkler had testified that he was reasonably certain Colin would need, let alone the items for which Winkler was not reasonably certain Colin would need. We conclude that although the court erroneously admitted irrelevant information about items which Winkler was not reasonably certain Colin would require, the error was harmless because it did not unfavorably affect the result of the trial.

### (b) Hearsay

At trial, the Gourleys displayed each page of the life care plan to the jury during Winkler's testimony. When his testimony was over, the court received the life care plan into evidence. As we understand their brief, Knolla and the OB/GYN Group argue that the life care plan was hearsay. They claim that as a result, the Gourleys should not have been allowed to show the life care plan to the jury during Winkler's testimony and that the court should not have received the life care plan into evidence. See *State v. Whitlock*, 262 Neb. 615, 634 N.W.2d 480 (2001) (holding expert's written appraisal inadmissible as hearsay which would unfairly emphasize his trial testimony).

Knolla and the OB/GYN Group, however, failed to preserve a hearsay objection to the life care plan. One may not on appeal assert a different ground for excluding evidence than was urged in the objection made to the trial court. *Benzel v. Keller Indus.*, 253 Neb. 20, 567 N.W.2d 552 (1997). The only grounds upon which Knolla and the OB/GYN Group objected to the life care plan were foundation, relevancy, speculation, and conjecture; they did not object to the life care plan because it was hearsay.

We note that one of their codefendants objected because the life care plan was a "narrative memorialization of testimony in a written form of the type that is normally not received." While this might be construed as a hearsay objection, Knolla and the OB/GYN Group did not join the objection. If a defendant does not offer an objection and does not expressly adopt a codefendant's objection, the matter is not preserved for him or her on

appeal. See, *Seaside Resorts v. Club Car*, 308 S.C. 47, 416 S.E.2d 655 (S.C. App. 1992); *Cook Associates, Inc. v. Warnick*, 664 P.2d 1161 (Utah 1983); *Thomas v. Bank of Springfield*, 631 S.W.2d 346 (Mo. App. 1982); *Wolfe v. East Texas Seed Co.*, 583 S.W.2d 481 (Tex. Civ. App. 1979). We will not consider the argument that the life care plan was hearsay.

### 3. "What to Expect When You're Expecting"

Knolla and the OB/GYN Group assert that the district court erred in receiving into evidence the book entitled "What to Expect When You're Expecting" (hereinafter the book). During the cross-examination of Knolla, the Gourleys marked the book as an exhibit and asked Knolla several questions about it. The Gourleys then offered the book into evidence. Knolla objected on the grounds that the book was hearsay and that it was irrelevant. In response, the Gourleys' counsel stated that the book was being offered only to show what information the OB/GYN Group would have provided to its patients in 1993. The court overruled the objections and received the book into evidence.

Initially, Knolla and the OB/GYN Group claim that the book contained inadmissible hearsay statements. Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Neb. Rev. Stat. § 27-801(3) (Reissue 1995). Out-of-court statements, if not offered for the purpose of proving the truth of the facts asserted, are not hearsay. *Wiekhorst Bros. Excav. & Equip. v. Ludewig*, 247 Neb. 547, 529 N.W.2d 33 (1995). Here, the book was not offered for the truth of its contents, but instead was offered for the limited purpose of showing what information the OB/GYN Group would have provided to its patients in 1993. The book was not hearsay.

Knolla and the OB/GYN Group also argue that the court should have excluded the book under Neb. Rev. Stat. § 27-403 (Reissue 1995) because its probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. But, "one may not on appeal assert a different ground for excluding evidence than was urged in the objection made to the trial court." *Benzel v. Keller Indus., Inc.*, 253 Neb. 20, 26, 567 N.W.2d 552, 557 (1997). The only

objections Knolla and the OB/GYN Group made at trial about the book were hearsay and relevance, the first of which is without merit for the reasons set out above and the second of which has not been raised on appeal. We will not consider the § 27-403 argument.

## 4. Constitutional Issues

Knolla and the OB/GYN Group argue that the cap in § 44-2825(1) is constitutional. The Gourleys argue that the cap violates principles of (1) special legislation, (2) equal protection, (3) open courts and right to a remedy, (4) right to a jury trial, (5) taking of property, and (6) separation of powers. The Gourleys rely solely on provisions of the state Constitution.

The Gourleys do not argue that the cap violates substantive due process or deprives them of life, liberty, and the pursuit of happiness as listed in their motion for new trial. Other than arguing equal protection, the Gourleys do not argue that Neb. Const. art. I, § 3, applies to their case. The Gourleys also did not argue to the trial court that the cap is unconstitutional as applied, nor do they make that argument on appeal.

When specific constitutional questions are presented, courts will not search for constitutional authority that was not raised and argued by the parties to overthrow a legislative enactment. See, e.g., *United States v. Spector*, 343 U.S. 169, 72 S. Ct. 591, 96 L. Ed. 863 (1952) (alternate constitutional ground for overturning statute not considered when appellee did not brief and argue issue); *Rice v. Rigsby and Davis v. Rigsby*, 259 N.C. 506, 131 S.E.2d 469 (1963) (addressing only constitutional issues raised in appellee's brief). Thus, we will consider only the specific constitutional arguments that the Gourleys raise and argue. See *Rice v. Rigsby and Davis v. Rigsby, supra*. Because we are asked to review numerous alternate grounds for finding the cap unconstitutional, we generally address the constitutional issues concerning the Gourleys' contentions.

### (a) Statutory Provisions and Background

The Nebraska Hospital-Medical Liability Act was created to address a perceived medical liability crisis. The act created a medical review panel, capped the amount of damages that could

be recovered, and created the Excess Liability Fund. Neb. Rev. Stat. §§ 44-2801 et seq. (Reissue 1998). Under the act, health care providers that do not opt out of the act's coverage must file proof of financial responsibility with the Director of Insurance and pay surcharges for the excess liability fund. §§ 44-2821 and 44-2824. The act allows patients to opt out of the act's coverage. § 44-2821(3). Section 44-2825 provides:

(1) The total amount recoverable under the Nebraska Hospital-Medical Liability Act from any and all health care providers and the Excess Liability Fund for any occurrence resulting in any injury or death of a patient may not exceed . . . (c) one million two hundred fifty thousand dollars for any occurrence after December 31, 1992.

(2) A health care provider qualified under the act shall not be liable to any patient or his or her representative who is covered by the act for an amount in excess of two hundred thousand dollars for all claims or causes of action arising from any occurrence during the period that the act is effective with reference to such patient.

(3) Subject to the overall limits from all sources as provided in subsection (1) of this section, any amount due from a judgment or settlement which is in excess of the total liability of all liable health care providers shall be paid from the Excess Liability Fund pursuant to sections 44-2831 to 44-2833.

#### (b) Special Legislation

The Gourleys contend that § 44-2825(1) is unconstitutional special legislation because it provides a special privilege to health care professionals while placing a burden on the most severely injured plaintiffs.

Neb. Const. art. III, § 18, provides:

The Legislature shall not pass local or special laws in any of the following cases, that is to say:

. . . .

Granting to any corporation, association, or individual any special or exclusive privileges, immunity, or franchise whatever . . . . In all other cases where a general law can be made applicable, no special law shall be enacted.

938

■ We described the purpose of the constitutional safeguard against special legislation in *Haman v. Marsh*, 237 Neb. 699, 709, 467 N.W.2d 836, 844-45 (1991), as follows:

By definition, a legislative act is general, and not special, if it operates alike on all persons of a class or on persons who are brought within the relations and circumstances provided for and if the classification so adopted by the Legislature has a basis in reason and is not purely arbitrary. . . . General laws embrace the whole of a subject, with their subject matter of common interest to the whole state. Uniformity is required in order to prevent granting to any person, or class of persons, the privileges or immunities which do not belong to all persons. . . . It is because the legislative process lacks the safeguards of due process and the tradition of impartiality which restrain the courts from using their powers to dispense special favors that such constitutional prohibitions against special legislation were enacted.

Thus, the focus of the prohibition against special legislation is the prevention of legislation which arbitrarily benefits or grants "special favors" to a specific class.

■ A legislative act constitutes special legislation if (1) it creates an arbitrary and unreasonable method of classification or (2) it creates a permanently closed class. *Bergan Mercy Health Sys. v. Haven*, 260 Neb. 846, 620 N.W.2d 339 (2000). This case does not involve a permanently closed class.

■ We have consistently stated that the test for determining the constitutionality of classifications is as follows:

"A legislative classification, in order to be valid, must be based upon some reason of public policy, some substantial difference of situation or circumstances, that would naturally suggest the justice or expediency of diverse legislation with respect to objects to be classified. Classifications for the purpose of legislation must be real and not illusive; they cannot be based on distinctions without a substantial difference. . . ." "Classification is proper if the special class has some reasonable distinction from other subjects of a like general character, which distinction bears some reasonable relation to the legitimate objectives and purposes

of the legislation. The question is always whether the things or persons classified by the act form by themselves a proper and legitimate class with reference to the purpose of the act."

*State ex rel. Douglas v. Marsh*, 207 Neb. 598, 609, 300 N.W.2d 181, 187 (1980). See, e.g., *Bergan Mercy Health Sys. v. Haven, supra*; *Big Johns Billiards v. Balka*, 260 Neb. 702, 619 N.W.2d 444 (2000); *Haman v. Marsh, supra*.

We note that a special legislation analysis is similar to an equal protection analysis, and often the two are discussed together because, at times, both issues can be decided on the same facts. See, generally, *Pfizer v. Lancaster Cty. Bd. of Equal.*, 260 Neb. 265, 616 N.W.2d 326 (2000) (addressing equal protection and special legislation separately, but deciding issues for same reasons). As a result, language normally applied to an equal protection analysis is sometimes used to help explain the reasoning employed under a special legislation analysis. *Id.* But the focus of each test is different. The analysis under a special legislation inquiry focuses on the Legislature's purpose in creating the class and asks if there is a substantial difference of circumstances to suggest the expediency of diverse legislation. This is different from an equal protection analysis under which the state interest in legislation is compared to the statutory means selected by the Legislature to accomplish that purpose. Under an equal protection analysis, differing levels of scrutiny are applied depending on if the legislation involves a suspect class. See, e.g., *Kuchar v. Krings*, 248 Neb. 995, 540 N.W.2d 582 (1995) (discussing special legislation and equal protection separately and applying differing tests); *Lerma v. Keck*, 186 Ariz. 228, 921 P.2d 28 (Ariz. App. 1996) (illustrating difference between equal protection and special legislation); *Etheridge v. Medical Center Hospitals*, 237 Va. 87, 376 S.E.2d 525 (1989) (upholding damages cap and discussing special legislation and equal protection separately).

This court has upheld the constitutionality of the Nebraska Hospital-Medical Liability Act. *Prendergast v. Nelson*, 199 Neb. 97, 256 N.W.2d 657 (1977). Discussing equal protection, we first held there was a reasonable basis for the classification. Then, in response to the argument that the medical review panel constituted

a special privilege for the health care provider and imposed an undue burden on the seriously injured patient, we stated:

> In this respect it must be remembered the Nebraska procedure is an elective one. Under the election, the act guarantees the claimant an assured fund . . . for the payment of any malpractice claim he [or she] may have. Under the common law remedy [the claimant] had no such guarantee and, as in the case of the plaintiff Prendergast, who has been unable to acquire any malpractice insurance, the likelihood of collecting a substantial judgment could be quite remote.

> Additionally, the claimant is assured of a procedure which will provide him access to an impartial medical review panel to determine whether the health care provider met the applicable standard of care. In return, claimant by his election agrees to the [cap]. . . . [T]he classification rests on reasons of public policy and a substantial difference between medical care providers and other tort-feasors. Suffice it to say that the constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the state's objective.

> . . . Nothing in the act suggests, as defendant infers, that the legislation involved was enacted for the relief of the medical care provider. The enactment was, and so appears to us to be, in the public interest. This is paramount.

*Id.* at 115, 256 N.W.2d at 669.

The Gourleys argue that *Prendergast* is not precedent because it did not have a four-judge majority. But, under Neb. Const. art. V, § 2, only three judges are necessary to determine that an act is constitutional. Further, even before *Prendergast* was decided, this court recognized the Legislature's concern over the rising cost of malpractice insurance and the substantial difference between medical practitioners and other tort-feasors. When holding that the statute of limitations for malpractice actions did not constitute special legislation, we stated:

> There are substantial reasons for legislative discrimination in regard to this field. We have seen in recent years the growth of malpractice litigation to the point where numerous insurance companies have withdrawn from this field. Insurance rates are practically prohibitive so that many

professional people must either remain unprotected or pass the insurance charges along to their patients and clientele in the form of exorbitant fees and charges. This unduly burdens the public which requires professional services.

*Taylor v. Karrer*, 196 Neb. 581, 586, 244 N.W.2d 201, 204 (1976), *disapproved on other grounds, Jorgensen v. State Nat. Bank & Trust*, 255 Neb. 241, 583 N.W.2d 331 (1998).

After *Prendergast v. Nelson*, 199 Neb. 97, 256 N.W.2d 657 (1977), was decided, we relied on it when determining that a different cap on damages was constitutional. In *Distinctive Printing & Packaging Co. v. Cox*, 232 Neb. 846, 443 N.W.2d 566 (1989), we upheld the constitutionality of a limit of recovery of damages under the parental liability statute, Neb. Rev. Stat. § 43-801 (Reissue 1998). In determining that § 43-801 did not violate principles of equal protection or the prohibition against special legislation, we cited *Prendergast* for the proposition that "certain limitations on recovery and differentiation among types of tort-feasors are permissible." *Distinctive Printing & Packaging Co. v. Cox*, 232 Neb. at 852, 443 N.W.2d at 572. We again cited *Prendergast* with favor in 1991. *Haman v. Marsh*, 237 Neb. 699, 713, 467 N.W.2d 836, 847 (1991) ("there are substantial reasons for legislative discrimination in regard to malpractice actions"). Further, in 2000, this court quoted and relied on language from *Prendergast,* stating that in *Prendergast,* we were "dealing with the fundamental right to adequate medical care" and affirming " 'the right of the Legislature to exercise the police power to promote the general health and welfare of the citizens of this state.' " *Bergan Mercy Health Sys. v. Haven*, 260 Neb. 846, 857, 620 N.W.2d 339, 348 (2000). We also quoted *Prendergast* as follows:

"Defendant . . . assumes the legislation was enacted to relieve doctors or insurance companies of some of their burden. We do not accept defendant's premise. Doctors and insurance companies are able to protect themselves against financial burdens by passing the cost on to their patients. Because they were doing so, [they] created part of the problem. The Legislature deemed it necessary to exercise its police power to make available qualified medical services at reasonable prices for the Nebraska public. We find no constitutional violation of this effort."

*Bergan Mercy Health Sys. v. Haven,* 260 Neb. at 857, 620 N.W.2d at 348. Thus, we have recognized on repeated occasions that the classification in the Nebraska Hospital-Medical Liability Act is based upon a reason of public policy. Further, we have recognized the existence of a substantial difference of situation or circumstances that justified diverse legislation for the classification.

The Gourleys argue, however, that § 44-2825(1) was not justified. The Gourleys point out that there was disagreement in the Legislature at the time § 44-2825(1) was enacted and conflicting testimony at the hearing on the motion for new trial. Thus, they argue that there never was an insurance crisis and that lifting the cap would have little effect on the cost of medical services. The Gourleys essentially ask that we independently review the wisdom of enacting the cap. We decline to do so.

Statutes are afforded a presumption of constitutionality, and the unconstitutionality of a statute must be clearly established before it will be declared void. *Bergan Mercy Health Sys. v. Haven, supra.* The Nebraska Legislature is presumed to have acted within its constitutional power despite that, in practice, its laws may result in some inequality. *Prendergast v. Nelson,* 199 Neb. 97, 256 N.W.2d 657 (1977).

It is commonly held that courts will not reexamine independently the factual basis on which a legislature justified a statute, nor will a court independently review the wisdom of the statute. See, e.g., *Phillips v. Mirac, Inc.,* 251 Mich. App. 586, 651 N.W.2d 437 (2002); *Guzman v. St. Francis Hospital, Inc.,* 240 Wis. 2d 559, 623 N.W.2d 776 (Wis. App. 2000); *Robinson v. Charleston Area Med. Center,* 186 W. Va. 720, 414 S.E.2d 877 (1991). See, generally, *Evans ex rel. Kutch v. State,* 56 P.3d 1046 (Alaska 2002). Instead, courts have inquired into "whether the legislature reasonably could conceive to be true the facts on which the challenged statute was based." *Robinson v. Charleston Area Med. Center,* 186 W. Va. at 730, 414 S.E.2d at 887. See *Prendergast v. Nelson, supra.* See, also, *Phillips v. Mirac, Inc., supra* (considering whether any set of facts either known or which could be reasonably assumed supports legislature's judgment). As one author has stated:

> The legislature has the ability to hear from everybody—plaintiff's lawyers, health care professionals, defense

lawyers, consumer groups, unions, and large and small business. . . . And, ultimately, legislators make a judgment. If the people who elected the legislators do not like the solution, the voters have a good remedy every two years: retire those who supported laws the voter's disfavor. These are but a few reasons why, over the years, legislators have received some due deference from courts.

Victor Schwartz, *Judicial Nullification of Tort Reform: Ignoring History, Logic, and Fundamentals of Constitutional Law*, 31 Seton Hall L. Rev. 688 (2001). This court does not sit as a super-legislature to review the wisdom of legislative acts. *State v. Hunt*, 220 Neb. 707, 371 N.W.2d 708 (1985), *disapproved on other grounds, State v. Palmer*, 224 Neb. 282, 399 N.W.2d 706 (1986); *Verba v. Ghaphery*, 210 W. Va. 30, 552 S.E.2d 406 (2001).

 Also, all reasonable intendments must be indulged to support the constitutionality of legislative acts, including classifications adopted by the Legislature. *State v. Hunt, supra.* If the Legislature had any evidence to justify its reasons for passing the act, then it is not special legislation if the class is based upon some reason of public policy, some substantial difference of situation or circumstances, that would naturally suggest the justice or expediency of diverse legislation concerning the objects to be classified. See *Prendergast v. Nelson, supra.* We reach this determination by considering what the Legislature could have found at the time the act was passed. See, generally, *Ralston v. County of Dawson*, 200 Neb. 678, 264 N.W.2d 868 (1978).

 It is not this court's place to second-guess the Legislature's reasoning behind passing the act. Likewise, "it is up to the legislature and not this Court to decide whether its legislation continues to meet the purposes for which it was originally enacted." *Verba v. Ghaphery*, 210 W. Va. at 36, 552 S.E.2d at 412 (upholding constitutionality of damages cap). Because we give deference to legislative factfinding and presume statutes to be constitutional, any argument that the record contains evidence that the act was not wise or necessary when it was enacted does not change the analysis.

Section 44-2825 was adopted under 1976 Neb. Laws, L.B. 434, but the legislative history is found under 1976 Neb. Laws, L.B. 703. At the committee hearing, the Legislature heard from

both proponents and opponents of the act. There was testimony from witnesses indicating that there was a problem recruiting physicians in the state and that increases in medical malpractice insurance were raising the cost of medical care. Public Health and Welfare Committee Hearing, L.B. 703, 84th Leg., 2d Sess. (Jan. 27, 1976). There was also testimony that a cap would not affect the cost of medical care, and some expressed the belief that the act was nothing more than a boon for insurance companies. *Id.* Generally, the proponents of the act expressed concern that an insurance crisis existed, but admitted that it was likely impossible to know if a cap on damages would solve the problem. Based on the information before it, the Legislature generally believed that a damages cap would solve the problem, especially when combined with the medical review panel and the Excess Liability Fund. *Id.* Thus, the Legislature set out a specific statement of findings and intent in the Nebraska Hospital-Medical Liability Act. In § 44-2801, the Legislature stated:

> (1) The Legislature finds and declares that it is in the public interest that competent medical and hospital services be available to the public in the State of Nebraska at reasonable costs, and that prompt and efficient methods be provided for eliminating the expense as well as the useless expenditure of time of physicians and courts in nonmeritorious malpractice claims and for efficiently resolving meritorious claims. It is essential in this state to assure continuing availability of medical care and to encourage physicians to enter into the practice of medicine in Nebraska and to remain in such practice as long as such physicians retain their qualifications.

> (2) The Legislature further finds that at the present time under the system in effect too large a percentage of the cost of malpractice insurance is received by individuals other than the injured party. The intent of sections 44-2801 to 44-2855 is to serve the public interest by providing an alternative method for determining malpractice claims in order to improve the availability of medical care, to improve its quality and to reduce the cost thereof, and to [e]nsure the availability of malpractice insurance coverage at reasonable rates.

Here, the Legislature had evidence to justify their reasons for passing the act. The class is based upon reasons of public policy and substantial differences of situation or circumstances that suggested the justice or expediency of diverse legislation.

Other states have also expressed agreement that a cap on damages for medical malpractice does not constitute special legislation. See *Etheridge v. Medical Center Hospitals*, 237 Va. 87, 376 S.E.2d 525 (1989). See, also, *Kirkland v. Blaine County Medical Center*, 134 Idaho 464, 4 P.3d 1115 (2000). There is recognition by both this court and others that there is evidence to justify the Legislature's actions.

To the extent that other courts have found damages caps to constitute special legislation, those cases do not conform to our legal precedent and are unpersuasive. See, e.g., *Best v. Taylor Mach. Works*, 179 Ill. 2d 367, 689 N.E.2d 1057, 228 Ill. Dec. 636 (1997) (Miller, J., concurring in part, and in part dissenting) (explaining reasons for disagreement with special legislation analysis as applied in *Best*). See, also, Matthew W. Light, Note, *Who's the Boss?: Statutory Damage Caps, Courts, and State Constitutional Law*, 58 Wash. & Lee L. Rev. 315 (2001) (criticizing cases holding that damages caps are unconstitutional). We conclude that the cap does not violate principles prohibiting special legislation.

### (c) Equal Protection

The Gourleys next contend that the cap violates the equal protection clause of the Nebraska Constitution. They first argue that the cap affects fundamental rights and ask that this court apply a "searching" or rigorous review. Brief for appellees the Gourleys at 56.

Neb. Const. art. I, § 3, states: "No person shall be deprived of life, liberty, or property, without due process of law, nor be denied equal protection of the laws." The party attacking a statute as violative of equal protection has the burden to prove that the classification violates the Equal Protection Clause. See *Pick v. Nelson*, 247 Neb. 487, 528 N.W.2d 309 (1995).

The Equal Protection Clause does not forbid classifications; it simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike.

*Pfizer v. Lancaster Cty. Bd. of Equal.*, 260 Neb. 265, 616 N.W.2d 326 (2000). In any equal protection challenge to a statute, the degree of judicial scrutiny to which the statute is to be subjected may be dispositive. If a legislative classification involves either a suspect class or a fundamental right, courts will analyze the statute with strict scrutiny. Under this test, strict accordance must exist between the classification and the statute's purpose. The result the Legislature seeks to effectuate must be a compelling state interest, and the means employed in the statute must be such that no less restrictive alternative exists. On the other hand, if a statute involves economic or social legislation not implicating a fundamental right or suspect class, courts will ask only whether a rational relationship exists between a legitimate state interest and the statutory means selected by the Legislature to accomplish that end. Upon a showing that such a rational relationship exists, courts will uphold the legislation. *Schindler v. Department of Motor Vehicles*, 256 Neb. 782, 593 N.W.2d 295 (1999); *State v. Garber*, 249 Neb. 648, 545 N.W.2d 75 (1996). Some legislative classifications, such as those based on gender, are reviewed under an intermediate level of scrutiny. See, e.g., *Friehe v. Schaad*, 249 Neb. 825, 545 N.W.2d 740 (1996).

A majority of jurisdictions apply a rational basis or other similar test and determine that a statutory cap on damages does not violate equal protection. See, e.g., *Phillips v. Mirac, Inc.*, 251 Mich. App. 586, 651 N.W.2d 437 (2002); *Guzman v. St. Francis Hospital, Inc.*, 240 Wis. 2d 559, 623 N.W.2d 776 (Wis. App. 2000); *Scholz v. Metropolitan Pathologists, P.C.*, 851 P.2d 901 (Colo. 1993) (en banc); *Murphy v. Edmonds*, 325 Md. 342, 601 A.2d 102 (1992); *Adams v. Children's Mercy Hosp.*, 832 S.W.2d 898 (Mo. 1992) (en banc); *Butler v. Flint Goodrich Hosp.*, 607 So. 2d 517 (La. 1992); *Peters v. Saft*, 597 A.2d 50 (Me. 1991); *Robinson v. Charleston Area Med. Center*, 186 W. Va. 720, 414 S.E.2d 877 (1991); *Fein v. Permanente Medical Group*, 38 Cal. 3d 137, 695 P.2d 665, 211 Cal. Rptr. 368 (1985); *Etheridge v. Medical Center Hospitals*, 237 Va. 87, 376 S.E.2d 525 (1989); *Johnson v. St. Vincent's Hospital*, 273 Ind. 374, 404 N.E.2d 585 (1980), *abrogated on other grounds, Collins v. Day*, 644 N.E.2d 72 (Ind. 1994). See, also, *Evans ex rel. Kutch v. State*, 56 P.3d 1046 (Alaska 2002) (reaching this conclusion but stating that it

was not binding precedent); *Trujillo v. City of Albuquerque*, 125 N.M. 721, 965 P.2d 305 (1998) (overruling use of heightened standard, but remanding for determination of constitutionality under rational basis standard); *Morris v. Savoy*, 61 Ohio. St. 3d 684, 576 N.E.2d 765 (1991) (finding no violation of equal protection, but finding damages cap unconstitutional on other grounds). A few jurisdictions have applied a heightened standard under their state constitution. See, *Carson v. Maurer*, 120 N.H. 925, 424 A.2d 825 (1980); *Arneson v. Olson*, 270 N.W.2d 125 (N.D. 1978).

The Gourleys contend that a heightened level of scrutiny should be applied to this case because the cap affects fundamental rights such as the right to a jury trial, full remedy, property, and medical care. They also argue that the cap affects a suspect class because plaintiffs with damages awards over the cap are " 'saddled with disabilities.' " Brief for appellees the Gourleys at 51. They also appear to argue that heightened scrutiny should apply because the Nebraska Unicameral system is more susceptible to influences from special interests. We disagree that a heightened level of scrutiny should be applied.

The right of access to the courts is important, but that right is impaired only by state action that limits or blocks access to the courts. See, generally, *Evans ex rel. Kutch v. State, supra.* The damages cap at issue does not limit access to the courts. Instead, it limits a plaintiff's recovery in court. *Id.* Further, access to the courts to pursue redress for injuries is not the type of fundamental right which requires heightened scrutiny. *Guzman v. St. Francis Hospital, Inc., supra.* In addition, the classification created by § 44-2825 is not based on suspect criteria. Instead, the Gourleys' interest in unlimited damages is economic. See *Guzman v. St. Francis Hospital, Inc., supra.* See, generally, *Evans ex rel. Kutch v. State, supra.* We find no merit in the argument that plaintiffs with damages awards over the cap are a suspect class or that heightened scrutiny should be applied because Nebraska has a unicameral legislative system. Because the interests at issue are economic, we apply the rational basis test.

Under the rational basis test, the Equal Protection Clause is satisfied as long as there is (1) a plausible policy reason for the classification, (2) the legislative facts on which the

classification is apparently based may rationally have been considered to be true by the governmental decisionmaker, and (3) the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational. *Pfizer v. Lancaster Cty. Bd. of Equal.*, 260 Neb. 265, 616 N.W.2d 326 (2000). The rational relationship standard is the most relaxed and tolerant form of judicial scrutiny under the Equal Protection Clause. *State v. Atkins*, 250 Neb. 315, 549 N.W.2d 159 (1996). Thus, when determining whether a rational basis exists for a legislative classification, courts look to see if any state of facts can be conceived to reasonably justify the disparate treatment which results. *Distinctive Printing & Packaging Co. v. Cox*, 232 Neb. 846, 443 N.W.2d 566 (1989).

As with their arguments about special legislation, the Gourleys contend that the act was unwise and unnecessary. But as we already discussed, we will not second guess the conclusions of the Legislature. Further, in economics and social welfare, a statute does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. *Pfizer v. Lancaster Cty. Bd. of Equal., supra*; *State v. Garber*, 249 Neb. 648, 545 N.W.2d 75 (1996). The fact that other schemes could have been selected does not mean that the scheme chosen is constitutionally infirm. *Id.* See *Pick v. Nelson*, 247 Neb. 487, 528 N.W.2d 309 (1995). As long as the classification scheme chosen by the Legislature rationally advances a reasonable and identifiable governmental objective, a court must disregard the existence of other methods that other individuals might have preferred. See *Pfizer v. Lancaster Cty. Bd. of Equal., supra*. Social and economic measures run afoul of the Equal Protection Clause only when the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that a court can only conclude that the Legislature's actions were irrational. *State v. Atkins, supra*.

The district court concluded that § 44-2825 was unconstitutional partially because it is a cap on all damages instead of a cap on only noneconomic damages. This does not change the analysis. A statute will not offend equal protection if a rational relationship exists between a legitimate state interest and the statutory means selected by the Legislature to accomplish that

end. We note that other courts have upheld statutes that cap all damages. See, *Butler v. Flint Goodrich Hosp.*, 607 So. 2d 517 (La. 1992); *Etheridge v. Medical Center Hospitals*, 237 Va. 87, 376 S.E.2d 525 (1989); *Johnson v. St. Vincent's Hospital*, 273 Ind. 374, 404 N.E.2d 585 (1980), *abrogated on other grounds, Collins v. Day*, 644 N.E.2d 72 (Ind. 1994).

Here, the Legislature was concerned about a perceived insurance crisis that could affect the ability of the state to recruit and retain physicians and increase the costs of medical care. Reducing health care costs and encouraging the provision of medical services are legitimate goals which can reasonably be thought to be furthered by lowering the amount of medical malpractice judgments. See, generally, *Evans ex rel. Kutch v. State*, 56 P.3d 1046 (Alaska 2002).

We have previously recognized these goals as legitimate legislative concerns. *Prendergast v. Nelson*, 199 Neb. 97, 256 N.W.2d 657 (1977); *Taylor v. Karrer*, 196 Neb. 581, 244 N.W.2d 201 (1976), *disapproved on other grounds, Jorgensen v. State Nat. Bank & Trust Co.*, 255 Neb. 241, 583 N.W.2d 331 (1998). Also, a rational relationship exists between the concern and the statutory means selected by the Legislature to accomplish its goal. We note that § 44-2825 was generally based on an Indiana act. Public Health and Welfare Committee Hearing, L.B. 703, 84th Leg., 2d Sess. 17 (Jan. 27, 1976). In *Johnson v. St. Vincent's Hospital, supra*, the Indiana Supreme Court upheld the damages cap in the Indiana act, and it noted that the act established a form of government-sponsored insurance, set limitations upon liability, and placed the burden upon persons injured by the industry. The court then stated:

An insurance operation cannot be sound if the funds collected are insufficient to meet the obligations incurred. It must, however, be accepted that the badly injured plaintiff who may require constant care will not recover full damages, yet at the same time we are impressed with the large amount which is recoverable and its probable ability to fully compensate a large proportion of injured patients. In the same vein, badly injured patients would have little or no chance of recovering large sums of money if the evil the act was intended to prevent were to come about, i.e., that an

environment would develop in the State in which private or public malpractice insurance were unavailable or unused. Of some relevance here is also the fact that after suit and recovery against a health care provider is completed, there continues a total life-time dependency upon other health care providers for vital treatment of the residuum of illness from the prior negligence and of new and unrelated illnesses. Thus to the extent that the limitation upon recovery is successful in preserving the availability of health care services, it does so to the benefit of the entire community including the badly injured plaintiff.

*Johnson v. St. Vincent's Hospital*, 273 Ind. at 396, 404 N.E.2d at 599. Although one may disagree with this reasoning, the Nebraska Legislature heard similar comments when it was considering enacting § 44-2825. Public Health and Welfare Committee Hearing, L.B. 703, 84th Leg., 2d Sess. (Jan. 27, 1976).

Finally, we note that some jurisdictions have held that a cap on damages violates equal protection. In some cases, the jurisdiction applied a heightened level of scrutiny, which we reject. See, *Carson v. Maurer*, 120 N.H. 925, 424 A.2d 825 (1980); *Arneson v. Olson*, 270 N.W.2d 125 (N.D. 1978). Another is unclear about the level of scrutiny. *Moore v. Mobile Infirmary Ass'n*, 592 So. 2d 156 (Ala. 1991). Several fail to give deference to the Legislature and engage in judicial factfinding, which we also reject. See, *Moore v. Mobile Infirmary Ass'n, supra*; *Arneson v. Olson, supra*. Another requires the provision of a replacement remedy, quid pro quo, to limit recovery of damages, which we reject and which will be discussed when dealing with the open courts provision of the Nebraska Constitution. See, e.g., *Wright v. Central Du Page Hosp. Ass'n*, 63 Ill. 2d 313, 347 N.E.2d 736 (1976). We find these cases unpersuasive. Thus, we conclude that the cap on damages in § 44-2825 satisfies principles of equal protection.

### (d) Open Courts and Right to Remedy

The Gourleys contend that § 44-2825 violates the open courts provision of the Nebraska Constitution and denies them their right to a remedy. They argue that common-law rights and remedies that were in place at the time the constitution was adopted are protected from legislative change.

Neb. Const. art. I, § 13, provides: "All courts shall be open, and every person, for any injury done him or her in his or her lands, goods, person, or reputation, shall have a remedy by due course of law and justice administered without denial or delay . . . ."

A majority of jurisdictions have held that a cap on damages does not violate the open courts and right to remedy provisions of their state constitution. *Guzman v. St. Francis Hospital, Inc.*, 240 Wis. 2d 559, 623 N.W.2d 776 (Wis. App. 2000); *Murphy v. Edmonds*, 325 Md. 342, 601 A.2d 102 (1992); *Robinson v. Charleston Area Med. Center*, 186 W. Va. 720, 414 S.E.2d 877 (1991); *Adams v. Children's Mercy Hosp.*, 832 S.W.2d 898 (Mo. 1992) (en banc); *Johnson v. St. Vincent's Hospital*, 273 Ind. 374, 404 N.E.2d 585 (1980), *abrogated on other grounds, Collins v. Day*, 644 N.E.2d 72 (Ind. 1994); *Jones v. State Board of Medicine*, 97 Idaho 859, 555 P.2d 399 (1976). See, generally, *Evans ex rel. Kutch v. State*, 56 P.3d 1046 (Alaska 2002); *Trujillo v. City of Albuquerque*, 125 N.M. 721, 965 P.2d 305 (1998). A minority of courts have held that a cap on damages violates a state constitution's open courts or right to remedy provision. *Matter of Certif. of Questions of Law*, 544 N.W.2d 183 (S.D. 1996); *Lucas v. U.S.*, 757 S.W.2d 687 (Tex. 1988).

It has long been the law of Nebraska, however, that the Legislature is free to create and abolish rights so long as no vested right is disturbed. *Peterson v. Cisper*, 231 Neb. 450, 436 N.W.2d 533 (1989). When upholding the constitutionality of the review panel provision of the act, we stated in *Prendergast v. Nelson*, 199 Neb. 97, 104, 256 N.W.2d 657, 663-64 (1977):

> Basically the contention is that the Legislature is powerless to alter a common law right. The law itself as a rule of conduct may be changed at the will or even at the whim of the Legislature unless prevented by constitutional limitations. . . . The Constitution does not forbid the creation of new rights, nor the abolition of old ones recognized by the common law, to attain a permissible legislative object.

Thus, we have held that no one has a vested interest in any rule of the common law or a vested right in any particular remedy. *Peterson v. Cisper, supra.*

The Gourleys contend that rights that were in place when the constitution was adopted are an exception to these rules. In the

alternative, they contend that the Legislature cannot change a remedy without providing an adequate replacement, or quid pro quo. We disagree.

Rejecting an argument that the common law in place at the time the constitution was adopted could not be changed, the Idaho Supreme Court stated: "To adopt that argument would be to hold that the common law as of 1890 governs the health, welfare and safety of the citizens of this state and is unalterable without constitutional amendment." *Jones v. State Board of Medicine*, 97 Idaho at 864, 555 P.2d at 404. Relying on a Colorado case, the court further noted that the open courts provision did not discuss the common law. Instead, the common law was adopted through another constitutional provision and through statute in Idaho. *Jones v. State Board of Medicine, supra*, citing *Vogts v. Guerrette*, 142 Colo. 527, 351 P.2d 851 (1960).

In Nebraska, the common law of England was adopted by statute. Neb. Rev. Stat. § 49-101 (Reissue 1998). Thus it exists here by legislative enactment and may be repealed. See *Vogts v. Guerrette, supra*. Section 44-2825(1) also does not bar access to the courts or deny a remedy. Instead it redefines the substantive law by limiting the amount of damages a plaintiff can recover. Although plaintiffs have a right to pursue recognized causes of action in court, they are not assured that a cause of action will remain immune from legislative or judicial limitation or elimination. *Adams v. Children's Mercy Hosp.*, 832 S.W.2d 898 (Mo. 1992) (en banc).

We have also held that if a common-law right is taken away, nothing need be given in return. *Prendergast v. Nelson, supra*. Because the Legislature can eliminate a common-law cause of action entirely, it can also alter the remedy for a cause of action without providing a replacement remedy, or quid pro quo. We conclude that § 44-2825(1) does not violate Neb. Const. art. I, § 13.

### (e) Jury Trial

The Gourleys contend that the cap violates their right to a trial by jury. Knolla and the OB/GYN Group counter that the Legislature can abolish a common-law cause of action and that

therefore, it follows that it can limit the amount of damages that can be recovered.

Neb. Const. art. I, § 6, provides:

The right of trial by jury shall remain inviolate, but the Legislature may authorize trial by a jury of a less number than twelve in courts inferior to the District Court, and may by general law authorize a verdict in civil cases in any court by not less than five-sixths of the jury.

Courts are split on whether a cap on damages violates the right to a jury trial. The majority of courts hold that a cap does not violate the right to trial by jury. *Phillips v. Mirac, Inc.*, 251 Mich. App. 586, 651 N.W.2d 437 (2002); *Kirkland v. Blaine County Medical Center*, 134 Idaho 464, 4 P.3d 1115 (2000); *Guzman v. St. Francis Hospital, Inc.*, 240 Wis. 2d 559, 623 N.W.2d 776 (Wis. App. 2000); *Scholz v. Metropolitan Pathologists, P.C.*, 851 P.2d 901 (Colo. 1993) (en banc); *Murphy v. Edmonds*, 325 Md. 342, 601 A.2d 102 (1992); *Adams v. Children's Mercy Hosp., supra*; *Etheridge v. Medical Center Hospitals*, 237 Va. 87, 376 S.E.2d 525 (1989). See, generally, *Evans ex rel. Kutch v. State*, 56 P.3d 1046 (Alaska 2002). In two of these cases, the constitutional provision at issue is generally the same as the provision in the Nebraska Constitution. *Kirkland v. Blaine County Medical Center, supra*; *Adams v. Children's Mercy Hosp., supra*. Other courts have applied language that is generally the same as the Nebraska Constitution and have concluded that a cap on damages does violate a plaintiff's right to a jury trial. *Lakin v. Senco Products, Inc.*, 329 Or. 62, 987 P.2d 463 (1999); *Matter of Certif. of Questions of Law*, 544 N.W.2d 183 (S.D. 1996); *Moore v. Mobile Infirmary Ass'n*, 592 So. 2d 156 (Ala. 1991); *Sofie v. Fibreboard Corp.*, 112 Wash. 2d 636, 771 P.2d 711 (1989), *amended* 780 P.2d 260. We disagree with the reasoning of those courts.

The purpose of article I, § 6, is to preserve the right to a jury trial as it existed at common law and under the statutes in force when the constitution was adopted. *State ex rel. Cherry v. Burns*, 258 Neb. 216, 602 N.W.2d 477 (1999); *State ex rel. Douglas v. Schroeder*, 222 Neb. 473, 384 N.W.2d 626 (1986). The primary function of a jury has always been factfinding, which includes a determination of a plaintiff's damages. See

*Adams v. Children's Mercy Hosp.*, 832 S.W.2d 898 (Mo. 1992) (en banc). The court, however, applies the law to the facts. *Id.* Section 44-2825 provides the remedy in a medical malpractice action. The remedy is a question of law, not fact, and is not a matter to be decided by the jury. See, e.g., *Adams v. Children's Mercy Hosp., supra*; *Murphy v. Edmonds, supra*; *Etheridge v. Medical Center Hospitals, supra.* See, generally, *Evans ex rel. Kutch v. State, supra.* Instead, the trial court applies the remedy's limitation only after the jury has fulfilled its factfinding function. See, e.g., *Murphy v. Edmonds, supra*; *Etheridge v. Medical Center Hospitals, supra.* See, generally, *Evans ex rel. Kutch v. State, supra.*

██ Further, as we have discussed, the Legislature has the right to completely abolish a common-law cause of action. *Peterson v. Cisper*, 231 Neb. 450, 436 N.W.2d 533 (1989). If the Legislature has the constitutional power to abolish a cause of action, it also has the power to limit recovery in a cause of action. See, e.g., *Adams v. Children's Mercy Hosp., supra.* We conclude that § 44-2825 does not violate the right to a jury trial.

(f) Taking of Property

The Gourleys next contend that the cap acts to take property in violation of Neb. Const. art. I, § 21. They argue that a cause of action and a jury's determination of damages are property.

Article I, § 21, states: "The property of no person shall be taken or damaged for public use without just compensation therefor." Article I, § 21, applies to vested property rights. See *Tracy v. City of Deshler*, 253 Neb. 170, 568 N.W.2d 903 (1997).

██ As previously discussed, we have held that a person has no property and no vested interest in any rule of the common law or a vested right in any particular remedy. *Peterson v. Cisper, supra.* Further, courts have rejected the argument that a cause of action and determination of damages are property. *Pulliam v. Coastal Emergency Services*, 257 Va. 1, 509 S.E.2d 307 (1999). See, generally, *Evans ex rel. Kutch v. State*, 56 P.3d 1046 (Alaska 2002). The cap on damages in § 44-2825 does not violate Neb. Const. art. I, § 21. We conclude that the Gourleys' argument is without merit.

## (g) Separation of Powers

The Gourleys contend that § 44-2825 violates the separation of powers provision of Neb. Const. art. II, § 1. They argue that the cap legislatively transfers their property to another, acts as a legislative remittitur, and acts as a legislative judgment on damages.

We have already stated that a person has no property and no vested interest in any rule of the common law or a vested right in any particular remedy. *Peterson v. Cisper, supra.* The Gourleys' argument about the legislative transfer of property is without merit. We also find no merit in the argument that the cap acts as a legislative judgment of damages. As we have discussed, the Legislature may abolish a common-law right or remedy. *Id.* For the same reasons the cap does not violate the right to a jury trial, it also does not act as a legislative determination of the amount of damages in any specific case.

We note that one court has held that a cap on damages improperly delegates to the Legislature the power to remit verdicts and judgments. *Best v. Taylor Mach. Works,* 179 Ill. 2d 367, 689 N.E.2d 1057, 228 Ill. Dec. 636 (1997). See, also, *Sofie v. Fibreboard Corp.,* 112 Wash. 2d 636, 771 P.2d 711 (1989), *amended* 780 P.2d 260 (indicating in dicta that cap might violate separation of powers). In *Best,* the court concluded that the determination whether a verdict was excessive was a discretionary function of the trial court and that a cap on damages improperly delegated that function to the Legislature.

Other courts, however, have determined that a cap on damages does not violate principles of separation of powers. See, e.g., *Verba v. Ghaphery,* 210 W. Va. 30, 552 S.E.2d 406 (2001); *Kirkland v. Blaine County Medical Center,* 134 Idaho 464, 4 P.3d 1115 (2000); *Guzman v. St. Francis Hospital, Inc.,* 240 Wis. 2d 559, 623 N.W.2d 776 (Wis. App. 2000); *Etheridge v. Medical Center Hospitals,* 237 Va. 87, 376 S.E.2d 525 (1989). See, generally, *Evans ex rel. Kutch v. State,* 56 P.3d 1046 (Alaska 2002). Most of these courts have specifically disagreed with the reasoning that a cap acts as a legislative remittitur. *Verba v. Ghaphery, supra; Kirkland v. Blaine County Medical Center, supra; Guzman v. St. Francis Hospital, Inc., supra.* See, generally, *Evans ex rel. Kutch v. State, supra.*

In *Kirkland*, the Idaho Supreme Court noted that nothing about the damages cap purported to limit the exercise of the judiciary's constitutional powers or jurisdiction. The court stated:

> Rather, if anything, the statute is a limitation on the rights of plaintiffs, not the judiciary. Because it is properly within the power of the legislature to establish statutes of limitations, statutes of repose, create new causes of action, and otherwise modify the common law without violating separation of powers principles, it necessarily follows that the legislature also has the power to limit remedies available to plaintiffs without violating the separation of powers doctrine.

*Kirkland v. Blaine County Medical Center*, 134 Idaho at 471, 4 P.3d at 1122.

We agree that the damages cap does not act as a legislative remittitur or otherwise violate principles of separation of powers. The cap does not ask the Legislature to review a specific dispute and determine the amount of damages. Instead—without regard to the facts of a particular case—the cap imposes a limit on recovery in all medical malpractice cases as a matter of legislative policy. We have stated repeatedly that the Legislature may change or abolish a cause of action. Thus, the ability to cap damages in a cause of action is a proper legislative function. See, *Verba v. Ghaphery, supra*; *Kirkland v. Blaine County Medical Center, supra*; *Etheridge v. Medical Center Hospitals, supra*. See, generally, *Evans ex rel. Kutch v. State, supra*. "Indeed, were a court to ignore the legislatively-determined remedy and enter an award in excess of the permitted amount, the court would invade the province of the legislature." *Etheridge v. Medical Center Hospitals*, 237 Va. at 101, 376 S.E.2d at 532. We determine that the cap on damages does not violate art. II, § 1.

## 5. CROSS-APPEAL

The Gourleys purported to file a cross-appeal assigning that the district court erred when it overruled the motion for new trial regarding the directed verdict for Nebraska Methodist. Nebraska Methodist filed a motion to dismiss, contending that this court lacks jurisdiction over the appeal because it was not filed within 10 days of the overruling of the motion for new trial. The motion

was denied. Nebraska Methodist then filed a brief arguing that this court lacks jurisdiction over the cross-appeal and that the cross-appeal was not properly filed.

The Gourleys' brief states on the cover that it is the brief of appellees and cross-appellants. An assignment of error appears on page 2 of the brief. Statements about jurisdiction, scope of review, and propositions of law are covered together for both the brief and any cross-appeal. The brief does not set out a separately designated section of the brief as the brief on cross-appeal. Instead, portions of the purported cross-appeal are scattered throughout the brief.

Neb. Ct. R. of Prac. 9D(4) (rev. 2000) provides:

Where the brief of appellee presents a cross-appeal, it shall be noted on the cover of the brief and it shall be set forth in a separate division of the brief. This division shall be headed "Brief on Cross-Appeal" and shall be prepared in the same manner and under the same rules as the brief of appellant.

■ The appellate courts of this state have repeatedly held that a cross-appeal must be properly designated under rule 9D(4) if affirmative relief is to be obtained. *Michael B. v. Donna M.*, 11 Neb. App. 346, 652 N.W.2d 618 (2002). See *Schindler v. Walker*, 256 Neb. 767, 592 N.W.2d 912 (1999).

The Gourleys admit that they "did not comply with most of the procedural requirements of [rule] 9D(4)." Reply brief for appellees the Gourleys at 8. They ask that this court exercise discretion and consider the cross-appeal although rule 9D(4) was not followed. We decline to do so.

## VI. CONCLUSION

We reverse that portion of the district court's judgment finding that § 44-2825(1) is unconstitutional and affirm the judgment in all other respects. The district court shall enter judgment for the Gourleys in the amount of $1,250,000.

AFFIRMED IN PART, AND IN PART REVERSED.

STEPHAN and MILLER-LERMAN, JJ., not participating.

CONNOLLY, J., concurring.

I agree with and join the majority opinion but write separately to address several issues raised by Justice McCormack's dissent.

After foraging for facts outside the record, Justice McCormack concludes in his dissent that the reason for the damages cap—availability of malpractice insurance at reasonable rates—no longer exists. The dissenting opinion states that "[n]ow, 27 years after enactment of the cap, the information available indicates otherwise." Citing from the Trends in 2002 Rates for Physicians' Medical Professional Liability Insurance (Med. Liab. Monitor 2002), the dissent concludes that the Nebraska Hospital-Medical Liability Act has not served to reduce the cost of medical malpractice insurance. But the dissent fails to provide all the data from the report. It also fails to note that while the cost of insurance has generally risen in all or most states, the overall cost of insurance in Nebraska is significantly less than it is in many states that do not have caps on damages. Thus, the data that the dissent uses can also support the argument that the cap has been effective in keeping the overall rate of insurance lower in Nebraska than in many other states.

Justice McCormack's dissent next refers to physicians' incomes, apparently for the proposition that because physicians earn substantial incomes, they can afford insurance. This misses the point. The Legislature was concerned when enacting the cap that physicians were leaving the medical practice or moving to states with a better malpractice climate because of the costs of insurance. A second concern was that as insurance prices rose, physicians would pass those costs on to their patients, resulting in more expensive health care. A physician's income is irrelevant to these problems. Physicians, like those in any other profession, seek to maximize income and thus will seek to practice in states where they have less overhead expenses and will pass any increase in overhead expenses on to their patients.

Although I find Justice McCormack's conclusions based on his statistical sources suspect, what is more inappropriate is that they are used at all. As the majority opinion stated, it is not the place of a court to second guess the wisdom of legislative acts, nor is it appropriate for a court to decide whether legislation continues to meet the purposes for which it was originally enacted. See *Verba v. Ghaphery*, 210 W. Va. 30, 552 S.E.2d 406 (2001). See, also, *State v. Hunt*, 220 Neb. 707, 371 N.W.2d 708 (1985), *disapproved on other grounds, State v. Palmer*, 224 Neb. 282,

399 N.W.2d 706 (1986); *Prendergast v. Nelson*, 199 Neb. 97, 256 N.W.2d 657 (1977). Of further concern is that the sources used in the dissent were not before the Legislature and are not in the record. Instead, if the evidence from the record were considered, the Gourleys presented little credible evidence that the cap was unwise or no longer necessary, while Knolla and the OB/GYN Group presented much more evidence supporting the cap.

Because the record and the dissent's use of statistics can be used to indicate differing points of view, one is left questioning which view is correct. What is clear is that a decision about the necessity of a damages cap cannot be decided based on a few incomplete sources. Instead, many differing sources must be considered. See, e.g., H.R. Rep. No. 108-32(I) (House Report from Committee on the Judiciary recommending enactment of damages cap and citing to numerous sources of information both in support of and in opposition to bill). The consideration of statistical sources to determine the wisdom of an act is the concern of the Legislature, not an appellate court. Were this court to start second guessing legislative enactments, principles of fairness and due process would require us to consider many sources of statistical information and hear from experts in the field. This court does not have the time or resources to engage in such a process, nor should we. That is not a judicial function. It is a legislative function that was carried out by the Legislature when it enacted Neb. Rev. Stat. § 44-2825 (Reissue 1998). The determination whether it is wise to continue the cap is also a legislative function.

This court's function is to neutrally review the constitutionality of legislation. It should not act as a second legislative chamber that can overturn legislation that it disagrees with. Although I am not entirely in agreement with the provisions of § 44-2825, this court is limited to reviewing the constitutionality of the act without engaging in a form of judicial legislation. Despite any personal concerns I have about the act, I conclude that it is constitutional.

Justice McCormack's dissent also suggests that this court's decision in *Prendergast, supra*, is not binding or persuasive authority. In *Prendergast*, three justices determined that portions of the Nebraska Hospital-Medical Liability Act were constitutional. Neb. Const. art. V, § 2, provides:

> The Supreme Court shall consist of seven judges . . . . A majority of the judges shall be necessary to constitute a quorum. A majority of the members sitting shall have authority to pronounce a decision except in cases involving the constitutionality of an act of the Legislature. No legislative act shall be held unconstitutional except by the concurrence of five judges.

Thus, three is the constitutionally appropriate number of judges necessary to agree that a legislative act is constitutional. Because three justices in *Prendergast v. Nelson*, 199 Neb. 97, 256 N.W.2d 657 (1977), held that portions of the act are constitutional, *Prendergast* is binding precedent. Also, as the majority opinion notes, we have consistently relied on *Prendergast* for the position that substantial reasons exist for legislative discrimination concerning malpractice actions. See *Haman v. Marsh*, 237 Neb. 699, 467 N.W.2d 836 (1991).

Moreover, a reading of the majority opinion makes clear that although the majority cited *Prendergast*, it also decided the issue after a thorough analysis regardless of *Prendergast*. Based on the authority cited by the majority, I would determine that the cap on damages in § 44-2825 is constitutional even if *Prendergast* had never been decided.

Next, relying largely on equal protection cases, the dissent would apply to a special legislation analysis a level of scrutiny comparable to the intermediate scrutiny test employed in an equal protection analysis. This is incorrect because, as the majority opinion states, the special legislation test is not a heightened test. Instead, it is simply a different test from that of equal protection. The rule advocated by the dissent introduces principles of equal protection into a special legislation analysis. Under the dissent's rule, legislation that was subject to a rational basis review under equal protection would always receive heightened scrutiny under a special legislation analysis. The effect would be a back door way of using an equal protection analysis to find legislation that passes muster under equal protection to be unconstitutional. A special legislation analysis has a different focus from an equal protection analysis and should not be used as a second equal protection clause under which everyone gets heightened scrutiny.

GERRARD, J., concurring.

In 1976, a precipitous process in the final stage of legislation led to the enactment of the Nebraska Hospital-Medical Liability Act. The act in significant instances unfairly deprives the Gourleys of the full measure of *economic damages* that is the most fundamental element of a meaningful recovery for negligently injured people. In a number of cases, people injured through no fault of their own will be unable to even collect their proven medical expenses. While I reluctantly concur with the per curiam opinion's conclusion that the act does not violate any of the provisions of the Nebraska Constitution that have been raised, briefed, and argued in this case, it would be injudicious to sit idly by and silently concur in a matter of such importance to so many parties. I, therefore, write separately to express my serious concerns about the public policy upon which the act is purportedly based and whether the act adequately protects the substantive due process rights of injured persons.

## ECONOMIC AND NONECONOMIC DAMAGES

The Nebraska Hospital-Medical Liability Act, Neb. Rev. Stat. § 44-2801 et seq. (Reissue 1998), limits an injured person to a total recovery of $1,250,000 for any single occurrence of medical professional malpractice. See § 44-2825(1). This limitation on total recovery ignores the distinctions to be made between different measures of damages and, as in the present case, can result in the inability of injured persons to recover even the expenses for their medical care. This unwarranted restriction on economic damages is, in my view, a fundamental flaw.

There are two separate types of compensatory damages, economic and noneconomic. Economic damages include the cost of medical care, past and future, and related benefits, i.e., lost wages, loss of earning capacity, and other such losses. Noneconomic losses include claims for pain and suffering, mental anguish, injury and disfigurement not affecting earning capacity, and losses which cannot be easily expressed in dollars and cents. See *McKissick v. Frye*, 255 Kan. 566, 876 P.2d 1371 (1994). See, also, *Gallion v. O'Connor*, 242 Neb. 259, 494 N.W.2d 532 (1993); Neb. Rev. Stat. § 25-21,185.08 (Reissue 1995). While both economic and noneconomic damages are intended to compensate plaintiffs

for their injuries, they do so in fundamentally different ways. Money damages are, at best, an imperfect means of compensating plaintiffs for intangible injuries. The effects of economic losses, on the other hand, can be fully ameliorated by the payment of money damages.

In other words, while the legal system cannot undo pain and suffering, it can and should provide that medical expenses be fully paid.

> "When liability has been demonstrated, the first priority of the tort system is to compensate the injured party for the economic loss he has suffered. . . . [I]t is unconscionable to preclude a plaintiff, by an arbitrary ceiling on recovery, from recovering all his economic damages, even though some lowering of medical malpractice premiums may result from the enactment of such a ceiling."

*Fein v. Permanente Medical Group*, 38 Cal. 3d 137, 160 n.17, 695 P.2d 665, 681 n.17, 211 Cal. Rptr. 368, 384 n.17 (1985) (quoting "Rep. of Com. on Medical Professional Liability (1977) 102 ABA Ann.Rep. 786, 849").

Noneconomic damages are generally the largest portion of a medical liability settlement. Grace Vandecruze, *Has the Tide Begun to Turn for Medical Malpractice?*, 15 No. 2 Health Law. 15 (2002). More significantly, unbridled noneconomic damages have been said to present the primary threat to maintaining reasonable malpractice premiums, because such awards are based on highly subjective perceptions and resist actuarial prediction. See *Matter of Certif. of Questions of Law*, 544 N.W.2d 183 (S.D. 1996). See, also, *Franklin v. Mazda Motor Corp.*, 704 F. Supp. 1325 (D. Md. 1989); *Murphy v. Edmonds*, 325 Md. 342, 601 A.2d 102 (1992); *Fein, supra*. See, generally, Mark C. Kendall, *Expectations, Imperfect Markets, and Medical Malpractice Insurance*, in The Economics of Medical Malpractice 167 (Simon Rottenberg ed., 1978); Judith K. Mann, *Factors Affecting the Supply Price of Malpractice Insurance*, in The Economics of Medical Malpractice 155 (Simon Rottenberg ed., 1978).

Recognizing these basic principles, the substantial majority of states that have enacted limitations on medical malpractice damages have limited noneconomic damages, but allowed complete recovery for economic losses. See, generally, 2 David W. Louisell

and Harold Williams, Medical Malpractice ¶ 18.26 (2002); Miles J. Zaremski and Frank D. Heckman, Reengineering Healthcare Liability Litigation, ch. 11 (1997 & Cum. Supp. 1999) (compiling state statutory provisions). Similarly, several courts upholding the constitutional validity of such limitations have, in so doing, noted the distinction between economic and noneconomic damages. See, *Franklin, supra*; *Adams v. Children's Mercy Hosp.*, 832 S.W.2d 898 (Mo. 1992) (en banc); *Fein, supra*; *Edmonds v. Murphy*, 83 Md. App. 133, 573 A.2d 853 (1990), *affirmed* 325 Md. 342, 601 A.2d 102 (1992) (upholding statutes that permitted complete recovery of economic damages). Compare *Matter of Certif. of Questions of Law, supra* (striking down cap because of limitation on recovery for economic damages).

## LEGISLATIVE PROCESS

The legislative history of the Nebraska Hospital-Medical Liability Act reflects awareness of the need to protect recovery for economic losses, but also reflects a legislative process that short circuited attempts to address that need. The parameters of what would become the act were first set forth in L.B. 703, 84th Legislature, 2d Session. As originally drafted, L.B. 703 would have capped total recovery, much like the present act, at $500,000. Testimony was heard by the Public Health and Welfare Committee reflecting the policy concerns set forth above, and it was decided to amend L.B. 703 to address those concerns. As amended by the committee, L.B. 703 would have capped general damages at $500,000, but placed no limitation on special damages. See Legislative Journal, 84th Leg., 2d Sess. 796 (Feb. 26, 1976).

However, L.B. 703, as amended, was held up on the floor of the Legislature. Instead, the general provisions of the original version of L.B. 703, prior to the committee amendment, were amended into a bill that had originally dealt with meat retailers. See Legislative Journal, L.B. 434, 84th Leg., 2d Sess. 1240 (Mar. 19, 1976). L.B. 434 was enacted by the Legislature. See 1976 Neb. Laws, L.B. 434. Because of the circuitous process by which the act became law, there is little evidence that the specific decision to cap both economic and noneconomic damages was fully considered by the Legislature. The members of the

Public Health and Welfare Committee were the only senators with the opportunity to hear and examine the witnesses who testified regarding the act. But the committee's determination to at least allow complete recovery for special damages, based on that testimony, was undone on the floor of the Legislature by parliamentary maneuvering.

## EXCESS LIABILITY FUND

Moreover, there is little suggestion that the Legislature fully considered how the different aspects of the act would interact. The primary concern of the Legislature seems to have been the problem of increasing malpractice insurance premiums, and it is evident that the cap on total damages was intended to reduce those premiums. However, an examination of the statutory scheme demonstrates that there is no significant relationship between the cap on total recovery and malpractice insurance premiums, because of the intervening effect of the Excess Liability Fund.

Under the act, a qualified health care provider shall not be liable to any patient for an amount in excess of $200,000 arising from any occurrence. See § 44-2825(2). Instead, subject to the overall limit established by § 44-2825(1), any amount due from a judgment in excess of the total liability of all liable health care providers shall be paid from the Excess Liability Fund. See § 44-2825(3). Health care providers are required to maintain professional liability insurance in the amount of $200,000 per occurrence. See § 44-2827. See, generally, *Brewington v. Rickard*, 235 Neb. 843, 457 N.W.2d 814 (1990).

To compensate for judgments above $200,000 per qualified health care provider, but below the cap on total recovery, the act creates the Excess Liability Fund (hereinafter the Fund), which is supported by a surcharge levied on all qualified health care providers. See § 44-2829. The amount of the surcharge is established by the Director of Insurance and is intended to maintain a reserve in the Fund "sufficient to pay all anticipated claims for the next year and to maintain an adequate reserve for future claims." See § 44-2830. However, the surcharge is not to exceed 50 percent of the annual premium paid by health care providers for their required malpractice insurance, except that a special surcharge may be levied if the amount in the Fund is inadequate

to pay all claims for a calendar year. See §§ 44-2829(2)(a) and 44-2831(1). The director may also obtain reinsurance for the Fund. See § 44-2831(2).

The effect of this scheme is to attenuate, if not almost completely sever, the relationship between the cap on total recovery and malpractice insurance premiums. Malpractice insurance premiums are established based on actuarial principles which generally evaluate, inter alia, the risk of liability and the predicted value of successful claims. See, generally, Judith K. Mann, *Factors Affecting the Supply Price of Malpractice Insurance*, in The Economics of Medical Malpractice 155 (Simon Rottenberg ed., 1978). Because of the Fund, however, the exposure of malpractice insurance carriers is limited to $200,000 arising out of any single occurrence for any single care provider. It is that figure, and not the cap on total liability, which must provide the primary basis for actuarial determinations of malpractice insurance premiums.

The cap on total recovery, then, has some, but minimal, bearing on the market cost of medical malpractice insurance. The cap on total recovery does not serve to limit the liability of malpractice insurers; instead, it limits the liability of the Fund. Unfortunately, the Legislature, in enacting the act, does not seem to have reflected on whether each of the specific provisions of the act were necessary or warranted in light of the remaining provisions. When considering the public policy rationale for the cap on total liability—and, more particularly, the cap on economic damages—the question is, To what extent can a limitation on recovery for proven economic losses be justified by a need to limit the potential liability of the Fund?

## SUBSTANTIVE DUE PROCESS

In my view, this question, when placed in its proper constitutional framework, implicates the constitutional right to substantive due process of law. There is a substantial overlap between the tests applied under due process and equal protection analysis. See, generally, *Condemarin v. University Hosp.*, 775 P.2d 348 (Utah 1989). The distinction is that equal protection and special legislation analyses are focused on the classes created by a statute and whether there is justification for making such classifications and treating those classes differently. See, e.g, *Bergan*

*Mercy Health Sys. v. Haven*, 260 Neb. 846, 620 N.W.2d 339 (2000). Due process, on the other hand, questions the justification for abrogating a particular legal right, and the appropriate scrutiny is determined by the importance of the right that is at issue. See, generally, *Condemarin, supra*. Thus, while the act does not create suspect classifications, and there may be some rational basis for treating health care tort-feasors differently from other tort-feasors, whether economic damages may be taken from negligently injured persons is a separate issue and calls for a different constitutional analysis. Because my concerns regard the nature of the basic right that has been taken—the right to recover for proven economic damages—those concerns are properly addressed by a due process analysis.

However, as the per curiam opinion correctly determines, the issue of substantive due process has not been brought before this court, and we are precluded from deciding, on the record and briefing before us, whether the act comports with that constitutional mandate. Nonetheless, my judicial responsibilities compel me to express my serious reservations regarding the act's satisfaction of constitutional due process, for the benefit of other litigants, the members of the Legislature, and their constituents, the public.

The Nebraska Constitution provides that "[n]o person shall be deprived of life, liberty, or property, without due process of law . . . ." Neb. Const. art. I, § 3. The concept of due process embodies the notion of fundamental fairness and defies precise definition. *Marshall v. Wimes*, 261 Neb. 846, 626 N.W.2d 229 (2001). The primary purpose of that constitutional guaranty is security of the individual from the arbitrary exercise of the powers of government. *Rein v. Johnson*, 149 Neb. 67, 30 N.W.2d 548 (1947). The Legislature may not, under the guise of regulation, set forth conditions which are unreasonable, arbitrary, discriminatory, or confiscatory. *State ex rel. Dept. of Health v. Jeffrey*, 247 Neb. 100, 525 N.W.2d 193 (1994).

Generally, classifications appearing in social or economic legislation require only a rational relationship between the state's legitimate interest and the means selected to accomplish that end. The ends-means fit need not be perfect; it need only be rational. *State v. Champoux*, 252 Neb. 769, 566 N.W.2d 763 (1997).

Accord *Robotham v. State*, 241 Neb. 379, 488 N.W.2d 533 (1992). But measures adopted by the Legislature to protect the public health and secure the public safety and welfare must still have some reasonable relation to those proposed ends. See, *Jeffrey, supra*; *Finocchiaro, Inc. v. Nebraska Liq. Cont. Comm.*, 217 Neb. 487, 351 N.W.2d 701 (1984). See, also, *Rein, supra*. There must be some clear and real connection between the assumed purpose of the law and its actual provisions. *Finocchiaro, Inc., supra*.

When a fundamental right or suspect classification is not involved in legislation, the legislative act is a valid exercise of the police power if the act is rationally related to a legitimate state interest. *Champoux, supra*. However, this begs the question whether the right to recover for economic losses is important enough to merit heightened scrutiny under the Nebraska Constitution. Although this court, because of the limitation on the issues presented, has no occasion in this case to determine the appropriate level of scrutiny to be applied in a due process analysis of a cap on economic damages, it is worth noting that several courts have concluded the right to recover damages for personal injury is essential, and caps on damages are subject to heightened judicial scrutiny in making constitutional determinations. See, e.g., *Matter of Certif. of Questions of Law*, 544 N.W.2d 183 (S.D. 1996); *Condemarin v. University Hosp.*, 775 P.2d 348 (Utah 1989); *Carson v. Maurer*, 120 N.H. 925, 424 A.2d 825 (1980); *Arneson v. Olson*, 270 N.W.2d 125 (N.D. 1978); *Jones v. State Board of Medicine*, 97 Idaho 859, 555 P.2d 399 (1976). As explained by the Supreme Court of South Dakota:

> Medical bills, lost wages, and prescription costs are tangible damages, whereas pain and suffering and like damages are largely intangible. Unbridled noneconomic damage awards present a real threat to maintaining reasonable malpractice insurance premiums, because such awards are unpredictable and based on highly subjective perceptions. . . . In truth, however, the . . . flat cap on total damages potentially cuts not only fat, but muscle, bone and marrow. If a malpractice patient's hospital bill, for example, exceeds the cap, then the patient can recover nothing for the remaining medical bills, future bills, past and future income lost, prescriptions, etc.

*Matter of Certif. of Questions of Law*, 544 N.W.2d at 200. The right to such recovery " 'is a substantial property right, not only of monetary value but in many cases fundamental to the injured person's physical well-being and ability to continue to live a decent life.' " *Condemarin*, 775 P.2d at 360, quoting *Hunter v. North Mason School Dist.*, 85 Wash. 2d 810, 539 P.2d 845 (1975).

The facts of the instant case demonstrate the callous effect of denying recovery for economic damages. The record shows that Colin suffered severe brain damage and will, for the rest of his life, be afflicted by cerebral palsy and extensive physical, cognitive, and behavioral deficiencies. The economic evidence presented by the Gourleys sets forth the expenses likely to be incurred over the course of Colin's life because of his disabilities, including medications, care, and medical treatment and equipment. The Gourleys' expert testified, without contradiction, that the expenses for Colin's care will total $12,461,500.22 over the course of his life. This figure has a present value of $5,943,111, of which the jury awarded $5 million. In short, it is undisputed that the Gourleys will recover, because of § 44-2825(1), less than one-fourth of Colin's medical expenses alone.

This effect on the quality of life of an injured child, incurred because of a statutory limitation on the right to collect economic damages, must be balanced against the act's only direct effect: the maintenance of the Fund. The evidence in this case does not indicate that the Fund requires financial protection. In fact, the evidence is far to the contrary. In 1998, the surcharge for qualified health care providers was 5 percent. The balance in the Fund at the end of 1998 was $62,625,074, and the estimated liabilities of (i.e., potential claims against) the Fund at that time were $24,014,000. Between 1990 and 1998, the amount of total claims paid in any given year ranged from a low of $1,795,069 in 1990 to a high of $4,197,308 in 1991. In 1998, the Fund *earned* over three times more than it paid out in claims, even disregarding the additional funds obtained through the surcharge (which, it should be noted, was only one-tenth of the surcharge permitted under the act).

Given the stark comparison between the assets of the Fund and the potential poverty that can result from forcing negligently injured persons to find their own means of paying for catastrophic

medical expenses, it may ultimately be determined that the act, in capping recovery for economic damages, is unconstitutional as applied to plaintiffs whose proven economic damages exceed the cap. This would not render the act completely inoperative, but would prelude application of the cap where it would prevent a complete recovery of economic damages. See, generally, *Olmer v. City of Lincoln*, 23 F. Supp. 2d 1091 (D. Neb. 1998), *affirmed* 192 F.3d 1176 (8th Cir. 1999); *Texas Workers' Compensation Com'n v. Garcia*, 893 S.W.2d 504 (Tex. 1995); *Whitehead Oil Co. v. City of Lincoln*, 245 Neb. 680, 515 N.W.2d 401 (1994) (distinguishing between facial challenge to statute, which asserts statute unconstitutional under all circumstances, and as-applied challenge, which asserts statute operates unconstitutionally because of party's unique circumstances).

I recognize the general principle that the wisdom and utility of legislation is a matter for the Legislature, and not the courts, and that judges should not substitute their social and economic beliefs for the judgment of legislative bodies. See, *City of Grand Island v. County of Hall*, 196 Neb. 282, 242 N.W.2d 858 (1976); *Major Liquors, Inc. v. City of Omaha*, 188 Neb. 628, 198 N.W.2d 483 (1972). See, also, e.g., *Ferguson v. Skrupa*, 372 U.S. 726, 83 S. Ct. 1028, 10 L. Ed. 2d 93 (1963); *Okl. Ed. Ass'n v. Alcoholic Bev. Laws Enf. Com'n*, 889 F.2d 929 (10th Cir. 1989). However, the discretion of the Legislature is circumscribed, as always, by the Nebraska Constitution, particularly where the abrogation of fundamental rights is concerned. The effect of the act on a substantial right—recovery of economic damages—is especially troubling, and potentially unreasonable, when balanced against the negligible effect that such recovery would have on the Fund.

The parties in this case have not presented the question whether the act, as applied, violates substantive due process, and I agree with the per curiam opinion's determination that we should not overthrow a legislative enactment on the basis of authority not raised and argued by the parties. The per curiam opinion expressly reserves ruling on such issues, which means that some of the most important questions about the act remain, for the time being, unanswered. This does not, however, prevent the Legislature from considering whether the act, in its current form, is fair, wise, or necessary, nor should it preclude legislative

changes to protect both the constitutional validity of the act and the well-being of the citizens of Nebraska.

## CONCLUSION

As previously stated, I concur, albeit grudgingly, in the per curiam opinion's conclusions regarding the constitutional challenges to the act. I join in the opinion of the court regarding the other issues presented. I remain deeply troubled by the public policy choices reflected in the act, particularly the denial of economic recovery to negligently injured persons. It is pointedly unfair, and may well prove unconstitutional, for the law of this state to safeguard a surplus of tens of millions of dollars in the Excess Liability Fund by denying negligently injured persons money for needed medical care and potentially condemning them to undue poverty. But, because this case does not afford us the opportunity to decide that constitutional question, I reluctantly concur in the judgment of the court.

HENDRY, C.J., joins in this concurrence.

HENDRY, C.J., concurring in part, and in part dissenting.

I concur with Justice Gerrard insofar as he suggests that the cap on damages imposed by Neb. Rev. Stat. § 44-2825(1) (Reissue 1998) may violate substantive due process rights of injured persons. I write separately, however, to state that for reasons similar to those expressed in my dissent in *Bergan Mercy Health Sys. v. Haven*, 260 Neb. 846, 620 N.W.2d 339 (2000) (Hendry, C.J., dissenting), I believe the Gourleys lack standing to challenge the Nebraska Hospital-Medical Liability Act as unconstitutional special legislation in violation of Neb. Const. art. III, § 18.

In assessing a special legislation claim, we must first determine the privilege created by the statute and the particular class which is singled out to receive the privilege. *Haven, supra.* See, also, *Swanson v. State*, 249 Neb. 466, 544 N.W.2d 333 (1996); *Stanton v. Mattson*, 175 Neb. 767, 123 N.W.2d 844 (1963). In my view, the privilege created by § 44-2825(1) is the cap on the total amount recoverable "from any and all health care providers . . . for any occurrence resulting in injury or death of a patient." The particular class singled out by the Legislature to receive the privilege is composed of "health care providers," which class is

limited to physicians, nurse anesthetists, qualifying professional entities, and hospitals. Neb. Rev. Stat. § 44-2803 (Reissue 1998).

Next, we must determine the persons within the general class which is made the subject of the legislation who stand in the same relation to the privilege as the particular class that receives the privilege. *Haven, supra.* See, also, *Swanson, supra*; *Stanton, supra.* Further, we must then determine whether the statute violates Neb. Const. art. III, § 18, either because the particular class which receives the privilege is a permanently closed class, or because the particular class has no reasonable distinction or substantial difference from the general class. *Haven, supra.* See, also, *Swanson, supra*; *Stanton, supra.*

I believe that the general class of persons standing in the same relation to the privilege would be all other health care professionals who are not "health care providers" as defined by the act, but who nonetheless may be liable "for bodily injury or death on account of alleged malpractice, professional negligence, failure to provide care, breach of contract, or other claim based upon failure to obtain informed consent for an operation or treatment." Neb. Rev. Stat. § 44-2822 (Reissue 1998). Such individuals could include, for example, optometrists (see Neb. Rev. Stat. § 71-1,135.06 (Cum. Supp. 2002)); dentists (see, generally, *Gordon v. Connell*, 249 Neb. 769, 545 N.W.2d 722 (1996), *Capps v. Manhart*, 236 Neb. 16, 458 N.W.2d 742 (1990), *DeCamp v. Lewis*, 231 Neb. 191, 435 N.W.2d 883 (1989), and *Pfeifer v. Konat*, 181 Neb. 30, 146 N.W.2d 743 (1966)); and chiropractors (see, generally, *Jones v. Malloy*, 226 Neb. 559, 412 N.W.2d 837 (1987)).

I therefore conclude that the only persons who would have standing to assert that § 44-2825(1) is unconstitutional special legislation are such members of the general class who do not benefit from the privilege of the cap on damages pursuant to § 44-2825(1). *Haven, supra.* See, also, *Swanson, supra*; *Stanton, supra.* Because in my view the Gourleys lack standing, I reserve judgment as to whether § 44-2825(1) violates Neb. Const. art. III, § 18, until the proper party, together with an adequate and proper record, is before the court.

Recognizing that courts are concerned only with the power of the legislative branch to enact statutes, and not a legislature's

wisdom, with the exception of its analysis regarding special legislation, I concur with the per curiam opinion. See, *U.S.D. No. 229 v. State*, 256 Kan. 232, 238, 885 P.2d 1170, 1175 (1994) (stating that " 'the function of the court is merely to ascertain and declare whether legislation was enacted in accordance with or in contravention of the constitution—and not to approve or condemn the underlying policy,' " quoting *Samsel v. Wheeler Transport Services, Inc.*, 246 Kan. 336, 789 P.2d 541 (1990)); *Fagas v. Scott*, 251 N.J. Super. 169, 211, 597 A.2d 571, 593 (1991) (stating that " 'judicial branch of the government does not and cannot concern itself with the wisdom or policy of a statute [and that s]uch matters are the exclusive concern of the legislative branch, and the doctrine is firmly settled that its enactment may not be stricken because a court thinks it unwise,' " quoting *N. J. Sports & Exposition Authority v. Mc Crane*, 61 N.J. 1, 292 A.2d 545 (1972)).

McCORMACK, J., concurring in part, and in part dissenting.

I agree with those portions of this court's per curiam opinion discussing the jury verdict, the life care plan, "What to Expect When You're Expecting," and the Gourleys' attempted cross-appeal. However, I respectfully dissent from the per curiam opinion's analysis of the constitutionality of Neb. Rev. Stat. § 44-2825(1) (Reissue 1998) (the cap). I would find that the cap is special legislation in violation of Neb. Const. art. III, § 18.

## PRENDERGAST V. NELSON

As recognized by the per curiam opinion, this court previously addressed the constitutionality of various provisions of the Nebraska Hospital-Medical Liability Act in *Prendergast v. Nelson*, 199 Neb. 97, 256 N.W.2d 657 (1977). I respectfully suggest that *Prendergast* is persuasive authority for next to nothing.

In *Prendergast*, a declaratory judgment action was brought by three health care providers against the director of the Nebraska Department of Insurance after the director refused to implement the provisions of the act. A three-judge plurality of this court upheld the constitutionality of numerous provisions of the act. Specifically, the plurality found that the cap was not an unconstitutional special privilege. *Prendergast v. Nelson, supra.* The plurality found it important that while a claimant who has not elected

out of the act's provisions may be limited in the amount of recovery, the claimant is guaranteed the existence of a fund from which to recover and is also guaranteed a procedure to provide an assessment of his or her claim. *Prendergast v. Nelson, supra.* The ability to elect out of the act's provisions and the tradeoff of the amount of recovery for the assessment and certainty of recovery persuaded the plurality that the cap did not offend any constitutional prohibition on the passage of special legislation.

The plurality opinion authored by Justice Spencer is one of six opinions filed in the case and is the *only* opinion in which any member of the court found that the cap is constitutional. A review of several of the remaining opinions discloses the dubious procedural posture upon which the plurality made its findings.

Justice Clinton concurred with the plurality with respect to "[t]he only justiciable issue before the court," i.e., whether the act granted the credit of the state in aid of an individual, association, or corporation under Neb. Const. art. XIII, § 3. *Prendergast v. Nelson,* 199 Neb. at 125, 256 N.W.2d at 674 (Clinton, J., concurring in part, and in part dissenting). As to the remaining issues, Justice Clinton admonished:

> Today this court, to the best of my knowledge, for the first time in its history renders what is, for the most part, an advisory opinion. In this respect it lamentably disregards its constitutional functions as a court. This course, if followed in the future, has ominous implications for the future political welfare of this state.

*Id.* at 122, 256 N.W.2d at 672.

In addition to the suspect procedural posture of the case, *Prendergast* also resulted in a severely fractured court. While Justice Clinton declined to reach any constitutional issues not properly raised, Justice White found that the cap was unconstitutional special legislation. *Id.* (White, J., dissenting in part). Justice McCown concurred with Justice White's opinion that the cap was unconstitutional special legislation. *Id.* (McCown, J., dissenting in part). Finally, Justice Boslaugh found that the election provision of the act—the saving grace of the cap according to the plurality—was "unrealistic and illusory." *Prendergast v. Nelson,* 199 Neb. 97, 133, 256 N.W.2d 657, 677 (1977) (Boslaugh, J., dissenting in part).

The fractures and procedural defects in *Prendergast* noted above have not gone unnoticed by other states. The North Dakota Supreme Court has noted that *Prendergast*

> is made less persuasive by the fact that the majority opinion is joined by only three of seven judges, with three others dissenting as to the constitutionality of a $500,000 limitation on recovery, and one judge declining to reach constitutional questions, since he questions the standing of some of the parties and concludes that the opinion is only advisory.

*Arneson v. Olson*, 270 N.W.2d 125, 131 (N.D. 1978). See, also, *Lucas v. U.S.*, 757 S.W.2d 687 (Tex. 1988); *Fein v. Permanente Medical Group*, 38 Cal. 3d 137, 695 P.2d 665, 211 Cal. Rptr. 368 (1985) (Bird, C.J., dissenting).

A court has the power neither to render advisory opinions nor to decide questions that cannot affect the rights of litigants in the case before it. *Preiser v. Newkirk*, 422 U.S. 395, 95 S. Ct. 2330, 45 L. Ed. 2d 272 (1975). The director of the Department of Insurance admittedly represented no person in *Prendergast* who was limited in the amount he or she could recover against a health care provider or whose constitutional rights were otherwise affected by the provisions of the act. *Prendergast v. Nelson, supra* (Clinton, J., concurring in part, and in part dissenting). Despite the lack of a concrete adversarial claim, a plurality of the court ventured forth to address whether the cap, evidently as applied to some hypothetical claimant, was constitutional. The present case suffers from no such defect. For the first time, the constitutionality of the cap has been presented to this court by parties with their own rights at stake. The Gourleys were awarded damages against Knolla and the OB/GYN Group in an amount exceeding the cap and now seek a determination that the cap is unconstitutional so that they may recover the full amount of their damages. The rights of the Gourleys and of Knolla and the OB/GYN Group are squarely at issue in this case.

The doctrine of stare decisis would typically require us to abide by the *Prendergast* decision and uphold the constitutionality of the cap, see *Metro Renovation v. State*, 249 Neb. 337, 543 N.W.2d 715 (1996), " ' " " *unless* the reasons therefor have ceased to exist, are clearly erroneous, or are manifestly wrong and mischievous or unless more harm than good will result from doing so,' " ' "

(emphasis in original) *State v. Reeves*, 258 Neb. 511, 527-28, 604 N.W.2d 151, 163 (2000). The U.S. Supreme Court describes stare decisis as a principle of policy rather than an inexorable command. *Hohn v. United States*, 524 U.S. 236, 118 S. Ct. 1969, 141 L. Ed. 2d 242 (1998). Where a fractured decision of this court rests upon tenuous procedural grounds, and where the current case presents clear adversaries serving to sharply focus the constitutional issues, I believe it would be a disservice to the parties to pronounce a decision based upon a case as ill-advised as *Prendergast*. Thus, I visit the issue anew.

## SPECIAL LEGISLATION

Neb. Const. art. III, § 18, provides:

> The Legislature shall not pass local or special laws in any of the following cases, that is to say:
>
> . . . .
>
> Granting to any corporation, association, or individual any special or exclusive privileges, immunity, or franchise whatever . . . . In all other cases where a general law can be made applicable, no special law shall be enacted.

By definition, a legislative act is general, and not special, if it operates alike on all persons of a class or on persons who are brought within the relations and circumstances provided for and if the classification so adopted by the Legislature has a basis in reason and is not purely arbitrary. *Haman v. Marsh*, 237 Neb. 699, 467 N.W.2d 836 (1991). A legislative act that applies only to particular individuals or things of a class is special legislation. *Id.* General laws embrace the whole of a subject, with their subject matter of common interest to the whole state. Uniformity is required in order to prevent granting to any person, or class of persons, the privileges or immunities which do not belong to all persons. *Id.* It is because the legislative process lacks the safeguards of due process and the tradition of impartiality which restrain the courts from using their powers to dispense special favors that such constitutional prohibitions against special legislation were enacted. *Id.*

A legislative act constitutes special legislation, violative of Neb. Const. art. III, § 18, if (1) it creates an arbitrary and unreasonable method of classification or (2) it creates a permanently

closed class. *Bergan Mercy Health Sys. v. Haven*, 260 Neb. 846, 620 N.W.2d 339 (2000). My focus is solely on whether the cap creates an arbitrary and unreasonable method of classification.

A legislative classification, in order to be valid, must be based upon some reason of public policy, some substantial difference of situation or circumstances, that would naturally suggest the justice or expediency of diverse legislation with respect to the objects to be classified. *Id*. Classifications for the purpose of legislation must be real and not illusive; they cannot be based on distinctions without a substantial difference. *Id*. When the Legislature confers privileges on a class arbitrarily selected from a large number of persons standing in the same relation to the privileges, without reasonable distinction or substantial difference, then the statute in question has resulted in the kind of improper discrimination prohibited by the Nebraska Constitution. *Id*.

In *Haman v. Marsh*, 237 Neb. at 713, 467 N.W.2d at 846-47, we had the opportunity to describe this test in greater detail:

> The narrower special legislation prohibition supplements the equal protection theory. . . . The test of validity under the special legislation prohibition is more stringent than the traditional rational basis test. Classifications must be based on some *substantial* difference of situation or circumstances that would naturally suggest the justice or expediency of diverse legislation with respect to the objects to be classified.

(Citation omitted.) (Emphasis in original.)

The above-quoted portion of *Haman* was necessary to resolve some confusion about the exact nature of the test and its relationship to the test applied in an equal protection case. The tests applied in an equal protection case are well known. If a statute involves economic or social legislation not implicating a fundamental right or suspect class, courts will ask only whether a rational relationship exists between a legitimate state interest and the statutory means selected by the Legislature to accomplish that end. *Schindler v. Department of Motor Vehicles*, 256 Neb. 782, 593 N.W.2d 295 (1999). The party challenging a statute's constitutionality has the burden to show that the statute has no rational basis. See *Hall v. Progress Pig, Inc.*, 259 Neb. 407, 610 N.W.2d 420 (2000). Upon a showing that such a rational relationship

exists, courts will uphold the legislation. *Schindler v. Department of Motor Vehicles, supra.* The intermediate scrutiny test requires that a party seeking to uphold a statute that classifies individuals must show that the classification serves important governmental objectives and that the discriminatory means employed are *substantially* related to achievement of those objectives. See *Mississippi University for Women v. Hogan,* 458 U.S. 718, 102 S. Ct. 3331, 73 L. Ed. 2d 1090 (1982). See, also, *Friehe v. Schaad,* 249 Neb. 825, 545 N.W.2d 740 (1996). Finally, if a legislative classification involves either a suspect class or a fundamental right, courts will analyze the statute with strict scrutiny. Under this test, strict congruence must exist between the classification and the statute's purpose. The end the Legislature seeks to effectuate must be a compelling state interest, and the means employed in the statute must be such that no less restrictive alternative exists. *Schindler v. Department of Motor Vehicles, supra.*

In *Haman v. Marsh,* 237 Neb. 699, 713, 467 N.W.2d 836, 846 (1991), we described special legislation as being a "narrower" test than equal protection. We further explained that "[t]he test of validity under the special legislation prohibition is *more stringent* than the traditional rational basis test." (Emphasis supplied.) *Id.* at 713, 467 N.W.2d at 846-47. See, also, *City of Ralston v. Balka,* 247 Neb. 773, 530 N.W.2d 594 (1995). The level of scrutiny required by the above-mentioned test is "more stringent" because of the requirement that classifications be based upon some *"substantial"* difference of situation or circumstances. (Emphasis in original.) *Haman v. Marsh,* 237 Neb. at 713, 467 N.W.2d at 847. See, also, *City of Ralston v. Balka, supra; MAPCO Ammonia Pipeline v. State Bd. of Equal.,* 238 Neb. 565, 471 N.W.2d 734 (1991) (emphasizing that classifications must be based upon some *substantial* difference of situation or circumstances); *State ex rel. Douglas v. Marsh,* 207 Neb. 598, 300 N.W.2d 181 (1980).

Because the test of validity under the special legislation prohibition is more stringent than the traditional rational basis test, I would apply a level of scrutiny comparable to the intermediate scrutiny test. It is well known that the degree of judicial scrutiny to which the statute is to be subjected may be dispositive. See *Schindler v. Department of Motor Vehicles, supra.*

That has proved to be the case in other states that have analyzed caps. Those states that have subjected caps to the minimal rational basis test have, as one might expect, found their caps to be constitutional. See, *Evans ex rel. Kutch v. State*, 56 P.3d 1046 (Alaska 2002); *Fein v. Permanente Medical Group*, 38 Cal. 3d 137, 695 P.2d 665, 211 Cal. Rptr. 368 (1985); *Scholz v. Metropolitan Pathologists, P.C.*, 851 P.2d 901 (Colo. 1993) (en banc); *Leliefeld v. Johnson*, 104 Idaho 357, 659 P.2d 111 (1983); *Johnson v. St. Vincent's Hospital*, 273 Ind. 374, 404 N.E.2d 585 (1980), *abrogated on other grounds, Collins v. Day*, 644 N.E.2d 72 (Ind. 1994); *Murphy v. Edmonds*, 325 Md. 342, 601 A.2d 102 (1992); *Phillips v. Mirac, Inc.*, 251 Mich. App. 586, 651 N.W.2d 437 (2002); *Adams v. Children's Mercy Hosp.*, 832 S.W.2d 898 (Mo. 1992) (en banc); *Morris v. Savoy*, 61 Ohio St. 3d 684, 576 N.E.2d 765 (1991); *Matter of Certif. of Questions of Law*, 544 N.W.2d 183 (S.D. 1996); *Etheridge v. Medical Center Hospitals*, 237 Va. 87, 376 S.E.2d 525 (1989); *Robinson v. Charleston Area Med. Center*, 186 W. Va. 720, 414 S.E.2d 877 (1991); *Guzman v. St. Francis Hospital, Inc.*, 240 Wis. 2d 559, 623 N.W.2d 776 (Wis. App. 2000). However, caps have generally been unable to survive a more stringent level of scrutiny. See, *Moore v. Mobile Infirmary Ass'n*, 592 So. 2d 156 (Ala. 1991); *Arneson v. Olson*, 270 N.W.2d 125 (N.D. 1978); *Carson v. Maurer*, 120 N.H. 925, 424 A.2d 825 (1980); *Condemarin v. University Hosp.*, 775 P.2d 348 (Utah 1989). But see *Jones v. State Board of Medicine*, 97 Idaho 859, 555 P.2d 399 (1976).

In analyzing a special legislation claim, we must determine (1) the privilege created by the statute, (2) the particular class which is singled out to receive the privilege, (3) the persons within the general class that is made the subject of the legislation who stand in the same relation to the privilege as the particular class, and (4) whether a substantial difference exists between the particular class and the general class. See *Bergan Mercy Health Sys. v. Haven*, 260 Neb. 846, 620 N.W.2d 339 (2000) (Hendry, C.J., dissenting).

The cap grants a privilege to all health care providers whose negligence causes catastrophic damages, i.e., damages in excess of $1,250,000, because they are liable for less than 100 percent

of the damages they cause. The general class standing in the same relation to these health care providers is all other professional service providers who commit malpractice and cause catastrophic damages and who are liable for 100 percent of the damages they cause. Is there a substantial difference between these two classes? I do not believe that there is. Each class provides services to the public. Each class is subject to actions brought by the public for malpractice committed in the course of providing those services to the public. Each class is financially burdened by those actions which prove to be successful. Each class may impose the costs of those successful actions on the public at large. Yet the Legislature has chosen to provide a benefit to one subset of the general class by exempting those health care providers whose negligence causes damages in excess of $1,250,000 from full liability for their negligent actions. Thus, I conclude that the cap is unconstitutional special legislation in violation of Neb. Const. art. III, § 18.

As Justice Gerrard discusses in greater detail, I am equally concerned by the fact that the cap applies to *all* damages, whether economic or noneconomic. Several states have struck down statutes that impose a cap on all damages. *Wright v. Central Du Page Hosp. Ass'n*, 63 Ill. 2d 313, 347 N.E.2d 736 (1976); *Arneson v. Olson, supra*; *State ex rel. OATL v. Sheward*, 86 Ohio St. 3d 451, 715 N.E.2d 1062 (1999); *Lucas v. U.S.*, 757 S.W.2d 687 (Tex. 1988). The majority of states with caps in effect today limit only the noneconomic damages a person may recover and do not limit recovery for economic damages. See Mark D. Clore, *Medical Malpractice Death Actions: Understanding Caps, Stowers, and Credits*, 41 S. Tex. L. Rev. 467, appendix A (2000). As the per curiam opinion notes, evidence offered at trial indicates that the Gourleys' economic damages, reduced to present value, is a minimum of $5,943,111. The jury failed to award even this amount, instead awarding $5 million in economic damages and $625,000 in noneconomic damages. However, by applying the cap and slashing the Gourleys' award to $1,250,000, the Gourleys receive an award which will cover only a fraction of their expenses over the course of Colin's lifetime and, in effect, receive nothing for their pain and suffering. See *Arneson v. Olson*, 270 N.W.2d 125 (N.D.

1978). If Nebraska followed the majority of states with caps that limited only noneconomic damages, the Gourleys would have been able to recover a large percentage of the expenses they will be burdened with for the rest of Colin's life. Had a valid challenge to the cap been preserved on substantive due process grounds, I would find that the cap violates that constitutional mandate as well for the reasons expressed by Justice Gerrard in his concurring opinion.

One of the stated purposes of the Nebraska Hospital-Medical Liability Act is to "[e]nsure the availability of malpractice insurance coverage at reasonable rates." Neb. Rev. Stat. § 44-2801(2) (Reissue 1998). As the per curiam opinion states, "the proponents of the act expressed concern that an insurance crisis existed, but admitted that it was likely impossible to know if a cap on damages would solve the problem. Based on the information before it, the Legislature generally believed that a damages cap would solve the problem . . . ." Now, 27 years after enactment of the cap, the information available indicates otherwise.

The following is a comparison of the base rates for physicians' liability insurance available in several states from various insurance companies for three different specialties: internal medicine, general surgery, and obstetrics-gynecology (OB/GYN). The data was obtained from Trends in 2002 Rates for Physicians' Medical Professional Liability Insurance (Med. Liab. Monitor 2002) (see, generally, http://www.medicalliabilitymonitor.com).

| STATE | 2001 RATE | 2002 RATE | % INCREASE SINCE 7/01 |
|---|---|---|---|
| **NEBRASKA** | | | |
| **Midwest Medical Insurance Co.:** | | | |
| Internal Medicine | $ 3,183 | $ 3,469 | 9.0% |
| General Surgery | 11,301 | 12,318 | 9.0 |
| OB/GYN | 17,297 | 18,854 | 9.0 |
| **PIC Wisconsin:** | | | |
| Internal Medicine | $ 2,256 | $ 2,786 | 23.4% |
| General Surgery | 7,114 | 9,474 | 33.1 |
| OB/GYN | 12,288 | 16,718 | 36.0 |
| **CALIFORNIA** | | | |
| **Cooperative of American Physicians:** | | | |
| Internal Medicine | $ 7,710 (So. Calif.) | $ 9,070 | 17.6% |

| | | | |
|---|---|---|---|
| Internal Medicine | 7,340 | 8,630 | 17.6 |
| (San Diego) | | | |
| Internal Medicine | 6,590 | 7,750 | 17.6 |
| (No. Calif.) | | | |
| General Surgery | 24,740 | 25,330 | 2.4 |
| (So. Calif.) | | | |
| General Surgery | 23,520 | 24,080 | 2.4 |
| (San Diego) | | | |
| General Surgery | 21,070 | 21,570 | 2.4 |
| (No. Calif.) | | | |
| OB/GYN | 42,330 | 43,350 | 2.4 |
| (So. Calif.) | | | |
| OB/GYN | 40,230 | 41,200 | 2.4 |
| (San Diego) | | | |
| OB/GYN | 36,020 | 36,890 | 2.4 |
| (No. Calif.) | | | |

**Northwest Physicians Mutual Insurance Co.:**

| | | | |
|---|---|---|---|
| Internal Medicine | $ 9,204 | $ 9,810 | 6.6% |
| (Los Angeles) | | | |
| Internal Medicine | 7,592 | 8,092 | 6.6 |
| (San Diego) | | | |
| Internal Medicine | 6,240 | 6,650 | 6.6 |
| (No. Calif. & rest of state) | | | |
| General Surgery | 25,080 | 30,704 | 22.4 |
| (Los Angeles) | | | |
| General Surgery | 20,879 | 24,073 | 15.3 |
| (San Diego) | | | |
| General Surgery | 17,783 | 20,448 | 15.0 |
| (No. Calif. & rest of state) | | | |
| OB/GYN | 46,938 | 56,406 | 20.1 |
| (Los Angeles) | | | |
| OB/GYN | 38,721 | 43,776 | 13.1 |
| (San Diego) | | | |
| OB/GYN | 33,226 | 37,238 | 12.1 |
| (No. Calif. & rest of state) | | | |

## COLORADO

**COPIC Insurance Co.:**

| | | | |
|---|---|---|---|
| Internal Medicine | $ 9,324 | $ 9,845 | 5.6% |
| General Surgery | 32,804 | 34,644 | 5.6 |
| OB/GYN | 29,265 | 30,905 | 5.6 |

**Doctors' Co.:**

| | | | |
|---|---|---|---|
| Internal Medicine | $ 8,482 | $ 8,876 | 14.8% |
| General Surgery | 29,906 | 32,657 | 14.8 |
| OB/GYN | 38,578 | 39,494 | 14.8 |

## FLORIDA
### First Professionals Insurance Co.:

| | | | |
|---|---|---|---|
| Internal Medicine | $ 38,378 | $ 56,153 | 46.3% |
| (Dade Cty.) | | | |
| Internal Medicine | 19,681 | 28,796 | 46.3 |
| (rest of state) | | | |
| General Surgery | 124,046 | 174,268 | 40.5 |
| (Dade Cty.) | | | |
| General Surgery | 63,614 | 89,368 | 40.5 |
| (rest of state) | | | |
| OB/GYN | 166,368 | 201,376 | 21.0 |
| (Dade Cty.) | | | |
| OB/GYN | 85,317 | 103,270 | 21.0 |
| (rest of state) | | | |

### Medical Assurance Co.:

| | | | |
|---|---|---|---|
| Internal Medicine | $ 17,611 | $ 26,794 | 52.1% |
| (Dade, Broward Ctys.) | | | |
| Internal Medicine | 10,232 | 15,460 | 51.1 |
| (rest of state) | | | |
| General Surgery | 63,189 | 95,474 | 51.1 |
| (Dade, Broward Ctys.) | | | |
| General Surgery | 36,277 | 54,677 | 50.7 |
| (rest of state) | | | |
| OB/GYN | 108,043 | 136,231 | 26.1 |
| (Dade, Broward Ctys.) | | | |
| OB/GYN | 61,908 | 77,949 | 25.9 |
| (rest of state) | | | |

### American Physicians Assurance Corp.:

| | | | |
|---|---|---|---|
| Internal Medicine | $ 30,272 | $ 49,494 | 63.5% |
| (Dade Cty.) | | | |
| Internal Medicine | 15,136 | 23,757 | 57.0 |
| (rest of state) | | | |
| General Surgery | 75,164 | 117,201 | 55.9 |
| (Dade Cty.) | | | |
| General Surgery | 37,582 | 56,256 | 49.7 |
| (rest of state) | | | |
| OB/GYN | 159,166 | 210,576 | 32.3 |
| (Dade Cty.) | | | |
| OB/GYN | 79,583 | 101,076 | 27.0 |
| (rest of state) | | | |

## IDAHO
### Doctors' Co.:

| | | | |
|---|---|---|---|
| Internal Medicine | — | $ 7,389 | 17.9% |
| General Surgery | — | 27,546 | 17.9 |
| OB/GYN | — | 32,262 | 17.9 |

**Medical Insurance Exchange of California:**

| | | | |
|---|---|---|---|
| Internal Medicine | $ 4,320 | $ 4,320 | 0.0% |
| General Surgery | 15,544 | 15,544 | 0.0 |
| OB/GYN | 25,904 | 25,904 | 0.0 |

**IOWA**

**American Physicians Assurance Corp.:**

| | | | |
|---|---|---|---|
| Internal Medicine | $ 4,374 | $ 4,374 | 0.0% |
| General Surgery | 14,386 | 14,386 | 0.0 |
| OB/GYN | 27,839 | 27,839 | 0.0 |

**Doctors' Co.:**

| | | | |
|---|---|---|---|
| Internal Medicine | — | $ 9,169 | 29.1% |
| General Surgery | — | 30,441 | 29.1 |
| OB/GYN | — | 39,852 | 29.1 |

**Midwest Medical Insurance Co.:**

| | | | |
|---|---|---|---|
| Internal Medicine | $ 5,412 | $ 6,168 | 14.0% |
| General Surgery | 16,325 | 18,607 | 14.0 |
| OB/GYN | 33,237 | 37,883 | 14.0 |

**KANSAS**

**Kansas Medical Mutual Insurance Co.:**

| | | | |
|---|---|---|---|
| Internal Medicine | $ 5,234 | $ 6,082 | 16.2% |
| General Surgery | 21,343 | 24,801 | 16.2 |
| OB/GYN | 33,082 | 38,441 | 16.2 |

**Medical Assurance Co.:**

| | | | |
|---|---|---|---|
| Internal Medicine | $ 3,522 | $ 3,522 | 0.0% |
| General Surgery | 14,090 | 14,090 | 0.0 |
| OB/GYN | 21,839 | 21,839 | 0.0 |

**NORTH DAKOTA**

**Doctors' Co.:**

| | | | |
|---|---|---|---|
| Internal Medicine | — | $ 6,712 | 0.8% |
| General Surgery | — | 18,006 | 0.8 |
| OB/GYN | — | 25,071 | 0.8 |

**Midwest Medical Insurance Co.:**

| | | | |
|---|---|---|---|
| Internal Medicine | $ 4,719 | $ 5,427 | 15.0% |
| General Surgery | 12,583 | 14,470 | 15.0 |
| OB/GYN | 21,628 | 24,872 | 15.0 |

**SOUTH DAKOTA**

**Doctors' Co.:**

| | | | |
|---|---|---|---|
| Internal Medicine | — | $ 5,395 | 19.7% |
| General Surgery | — | 19,958 | 19.7 |
| OB/GYN | — | 23,950 | 19.7 |

**Midwest Medical Insurance Co.:**

| | | | |
|---|---|---|---|
| Internal Medicine | $ 2,527 | $ 2,906 | 15.0% |
| General Surgery | 6,737 | 7,748 | 15.0 |
| OB/GYN | 11,580 | 13,317 | 15.0 |

The statistics cited above indicate a general upward trend in malpractice rates in Iowa and North Dakota—states that do not cap damages in medical malpractice actions. Belying the story line advanced by cap proponents, however, the same general upward trend is exhibited in states *with* caps, such as Nebraska, California, Colorado, Florida, Idaho, Kansas, and South Dakota. It appears that at least one of the intended goals of caps, to ensure reasonable malpractice rates, remains unmet—unfortunate news to the catastrophically injured such as Colin and his family, who can recover only approximately 20 percent of their medical costs so that some medical providers can enjoy what they consider to be reasonable rates. And while the absolute amount for malpractice insurance may, in some states, be burdensome, the data available suggests that insurance rates are not so "practically prohibitive," as we stated in *Taylor v. Karrer*, 196 Neb. 581, 586, 244 N.W.2d 201, 204 (1976), *disapproved on other grounds, Jorgensen v. State Nat. Bank & Trust Co.*, 255 Neb. 241, 583 N.W.2d 331 (1998), relative to physicians' incomes, as seen from the following data compiled by the American Medical Association:

GENERAL PRACTICE:

| | MEAN | MEDIAN |
|---|---|---|
| Gross Revenue | $457,800 | $369,000 |
| Professional Expenses | 263,000 | 184,000 |
| Professional Liability | 10,900 | 7,000 |
| Income After All Expenses Including Malpractice Premiums | 142,500 | 130,000 |

GENERAL INTERNAL MEDICINE:

| | MEAN | MEDIAN |
|---|---|---|
| Gross Revenue | $419,400 | $357,000 |
| Professional Expenses | 225,900 | 160,000 |
| Professional Liability | 10,800 | 6,000 |
| Income After All Expenses Including Malpractice Premiums | 157,900 | 140,000 |

INTERNAL MEDICINE-CARDIOLOGY:

| | MEAN | MEDIAN |
|---|---|---|
| Gross Revenue | $689,200 | $676,000 |
| Professional Expenses | 381,700 | 313,000 |

| Professional Liability | 27,100 | 12,000 |
|---|---|---|
| Income After All Expenses | | |
| Including Malpractice Premiums | 294,600 | 230,000 |

SURGERY-GENERAL:

| | MEAN | MEDIAN |
|---|---|---|
| Gross Revenue | $454,100 | $359,000 |
| Professional Expenses | 201,700 | 131,000 |
| Professional Liability | 24,900 | 23,000 |
| Income After All Expenses | | |
| Including Malpractice Premiums | 246,800 | 215,000 |

SURGERY-ORTHOPEDIC:

| | MEAN | MEDIAN |
|---|---|---|
| Gross Revenue | $748,500 | $668,000 |
| Professional Expenses | 417,100 | 324,000 |
| Professional Liability | 34,200 | 28,000 |
| Income After All Expenses | | |
| Including Malpractice Premiums | 312,500 | 280,000 |

OB/GYN:

| | MEAN | MEDIAN |
|---|---|---|
| Gross Revenue | $627,000 | $515,000 |
| Professional Expenses | 375,900 | 272,000 |
| Professional Liability | 35,800 | 33,000 |
| Income After All Expenses | | |
| Including Malpractice Premiums | 214,400 | 200,000 |

Physician Socioeconomic Statistics 2000-2002 (John D. Wassenaar and Sara L. Thran, eds., Am. Med. Assn. 2001). While the income figures cited above are based on a nationwide sample of physicians, the study noted that "[g]eographic differences in income are less pronounced than for other" categories tabulated. James W. Moser, *Physician Income Trends*, in Physician Socioeconomic Statistics 2000-2002, *supra.*

I respectfully dissent from the per curiam opinion's conclusion that the cap is constitutional.

CARLSON, Judge, concurring in part, and in part dissenting.

I join in Justice McCormack's concurrence and dissent. I also agree with Justice Gerrard's concurrence in regard to his substantive due process analysis.